335 F.3d 325
 Lisa L. OCHELTREE, Plaintiff-Appellee,
v.
SCOLLON PRODUCTIONS, INCORPORATED, Defendant-Appellant.
Lawyers' Committee for Civil Rights Under Law; Asian American Legal Defense and Education Fund; Public Justice Center; Women's Law Center of Maryland, Incorporated; D.C. Employment Justice Center; Women's Law Project; American Civil Liberties Union Women's Rights Project; Equal Employment Opportunity Commission, Amici Supporting Appellee.
 No. 01-1648.
 United States Court of Appeals, Fourth Circuit.
 Argued: February 25, 2003.
 Decided: July 18, 2003.
 
 COPYRIGHT MATERIAL OMITTED ARGUED: Charles Franklin Thompson, Jr., Tally, Malone, Thompson & Gregory, Columbia, South Carolina, for Appellant. William Elvin Hopkins, Jr., McCutchen, Blanton, Rhodes & Johnson, L.L.P., Columbia, South Carolina, for Appellee. Louis Lopez, Office of General Counsel, Equal Employment Opportunity Commission, Washington, D.C., for Amicus Curiae Commission. ON BRIEF: Michael D. Malone, Tally, Malone, Thompson & Gregory, Columbia, South Carolina, for Appellant. Nicholas M. Inzeo, Acting Deputy General Counsel, Philip B. Sklover, Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, Office of General Counsel, Equal Employment Opportunity Commission, Washington, D.C., for Amicus Curiae Commission. Michael L. Foreman, Audrey A. Jordan, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., for Amici Curiae Committee, et al. Wendy N. Hess, Murnaghan Appellate Advocacy Fellow, Public Justice Center, Baltimore, Maryland, for Amici Curiae Center, et al.
 Before WILKINS, Chief Judge, and WIDENER, WILKINSON, NIEMEYER, LUTTIG, WILLIAMS, MICHAEL, MOTZ, TRAXLER, KING, GREGORY, and SHEDD, Circuit Judges.
 Affirmed in part and reversed in part by published opinion. Judge MICHAEL wrote the opinion, in which Chief Judge WILKINS, Judge WILKINSON, Judge LUTTIG, Judge DIANA GRIBBON MOTZ, Judge TRAXLER, Judge KING, Judge GREGORY, and Judge SHEDD joined. Judge NIEMEYER wrote a separate opinion, concurring in the judgment. Judge WILLIAMS wrote a separate opinion, dissenting in part and concurring in the judgment in part, in which Judge WIDENER joined.
 OPINION
 MICHAEL, Circuit Judge:
 
 
 1
 A jury found that Lisa Ocheltree, a plaintiff suing under Title VII of the Civil Rights Act of 1964, was the victim of severe or pervasive sex-based harassment in her workplace at Scollon Productions, Inc. We granted en banc review to consider whether the district court properly denied the company's motion for judgment as a matter of law. Because there is a "legally sufficient evidentiary basis," Fed.R.Civ.P. 50(a)(1), for the jury's finding that Ocheltree proved the elements of her claim, we affirm the judgment insofar as it awards compensatory damages. However, because there is no evidence that Scollon Productions had the knowledge required for liability in punitive damages, we reverse the award of punitive damages.
 
 I.
 
 2
 Scollon Productions makes costumes, including ones depicting university mascots and cartoon characters. The company has about fifty employees and is located in White Rock, South Carolina. J.A. 283. The only persons with formal management authority at the company are Bill Scollon, the president, and Ellery Locklear, the senior vice president. J.A. 157, 282, 288. The company's production facilities include a sewing room and what is called the production shop. The production shop itself is fairly small, with enough work tables to accommodate about a dozen employees, including the shop supervisor. J.A. 109-11, 211-12, 216, 287. Bill Scollon and Locklear have their offices near the production facilities. J.A. 216.
 
 
 3
 Ocheltree was employed at Scollon Productions for eighteen months, from February 1994 until August 1995. She worked in the production shop making shoes. Ocheltree was the only female employee in the shop, working alongside ten or eleven men. J.A. 103, 110. In the early stages of her employment, the atmosphere in the shop was "fun" and "friendly," but this changed. During her first year there, coarse sexual talk and sexual antics by several of the men began to occur with increasing frequency. This misconduct worsened as time went on, especially after Ocheltree complained to the men and the shop supervisor, Harold Hirsch. J.A. 111-14, 199-200, 202-03. The details of the sexual talk and conduct that Ocheltree heard and saw during her tenure in the production shop are as follows.
 
 
 4
 Scollon Productions has mannequins that are used in the production of its costumes. Some of the men in the production shop often used a female-form mannequin as a prop to engage in sexual antics in front of Ocheltree. Many times when Ocheltree was in sight of the mannequin, the men would fondle it or use it to demonstrate sexual techniques, including oral sex. J.A. 200-02. One shop employee, Brian Hodge, noticed that "anytime [Ocheltree] was walking by just about they would do something sexual to the mannequin in front of her." J.A. 202. On one occasion, for example, two male shop employees were positioned at the mannequin when Ocheltree arrived at work. One was pinching the mannequin's nipples, and the other was on his knees simulating oral sex on the mannequin. Ocheltree said to the men, "You guys are disgusting, this needs to stop." The incident prompted Ocheltree to leave the room. As she walked out, she heard laughter in the background. J.A. 115-17.
 
 
 5
 On another occasion a male coworker came up to Ocheltree in the production shop and sang the following song to her "like he was in the opera": "Come to me, oh, baby come to me, your breath smells like c[o]m[e] to me." J.A. 114-15. Ocheltree immediately told the man that he was disgusting. Nevertheless, the other men in the production shop, including supervisor Hirsch, expressed their enjoyment of the incident with much laughter. Id. On still another occasion when Ocheltree was seated at her work station, some of her male coworkers were looking at a book that contained pictures of men with pierced genitalia. One coworker took the book, approached Ocheltree, and opened it to the centerfold photograph showing a man's crotch area. The scrotum was pierced with hoops, and there were chains running up to the top of the penis. The coworker, with his male colleagues looking on, said, "Lisa, what do you think about this?" Again, this generated laughter from the men in the shop. J.A. 117-18.
 
 
 6
 As time went on, Ocheltree's male coworkers subjected her to a daily stream of discussion and conduct that was sex based or sexist. J.A. 114, 120, 204, 214. First, the men in the production shop used explicit sexual insults to needle each other in front of Ocheltree. For example, "[g]uys would make hand gestures down at their private parts and tell other guys to suck it." J.A. 113. Some of the men at times suggested that two of their number were involved in a homosexual relationship. The men engaging in this sort of talk "pick[ed] on" their subjects by discussing the details of anal sex, saying specifically that they "wonder[ed] who was on top and who took it up the ass." J.A. 200. There were also comments that one employee was having sex with a dog. J.A. 229. Second, Ocheltree's male coworkers constantly discussed their sexual exploits with their wives and girlfriends in extremely graphic terms. The men talked every day about their sexual experiences of the night before, making comments about their female partners such as "she swallowed, she gave good head, [or] I fucked her all night long." J.A. 118. One employee announced that his girlfriend "gave good head[,] that she likes to swallow, that she liked it from behind, [and] that she would do it anywhere with him." J.A. 120. He added that she "could suck a golf [ball] through a garden hose." Id. Another employee in the shop often "would speak of [his wife] sucking his dick and swallowing and letting it run down the side of her face and stuff." J.A. 200. Finally, on one occasion, shop supervisor Hirsch said that he was interested in having sex with young boys and that he "enjoyed ... licking young boys['] dicks." J.A. 119. Ocheltree was convinced that Hirsch and other men in the shop engaged in sexual talk and antics "in front of [her] because they enjoyed looking at [her] and seeing [her] reaction." J.A. 119. Indeed, Hirsch frequently joined in the shoproom laughter that erupted at Ocheltree's expense. J.A. 115, 118. There were times when the sexual talk in the production shop got so far out of hand that Ocheltree would "turn red [and] would have to get up and leave [her] work area ... just to get away from the atmosphere." J.A. 120.
 
 
 7
 According to Bill Scollon, his company has a sexual harassment policy that is covered by the section entitled "Talking" in the employee handbook. J.A. 299-300, 352. Sexual harassment is not mentioned in the section. It only states that "[l]oud talking, yelling, uncontrolled laughter, swearing, and verbal abuse of co-workers, and supervisors is not acceptable. Verbal abuse, swearing, etc. are grounds for termination." J.A. 352. The handbook's "Open Door Policy" directs that "[a]nyone having a complaint or problem should first try to resolve it with their immediate supervisor." J.A. 355. The policy goes on to say that "Ellery [Locklear] or Bill [Scollon] are usually available throughout the day to help resolve complaints or problems not resolved by supervisors." Id.
 
 
 8
 Ocheltree believed that she was being subjected to sexual harassment in her workplace, and she made attempts to register complaints as the employee handbook prescribed. She complained repeatedly to Hirsch, the shop supervisor, who ignored the problem. J.A. 122. Ocheltree then attempted to register her concerns with Scollon and Locklear, but in Ocheltree's words, "[t]hey wouldn't give [her] the time of day." J.A. 137. She went to Scollon's office several times and asked if he had a minute to talk with her. J.A. 122-23. In each instance Scollon told her that he did not have time and that she should "go see Mr. Locklear" or "go back to work." J.A. 123-24. Scollon acknowledges that on one occasion when Ocheltree attempted to speak with him, he told her it was not an appropriate time. He admits that he turned her away because he believed that whatever she wanted to talk about was not important. J.A. 299. Locklear was likewise never available to hear Ocheltree's complaints. Once when Ocheltree went to Locklear's office, he was on the telephone; she put a note on his desk, saying: "Ellery, Need to talk to you, very important, Lisa." J.A. 123. She underlined "very important." Locklear indicated that he saw the note, but he never talked with her. Id. When Ocheltree left her work station because the sexual and sexist talk was getting out of hand, Hirsch would follow her to prevent her from speaking to Scollon or Locklear. J.A. 120, 123-24. For example, if she took refuge in the bathroom at these times, Hirsch would often be waiting when she emerged, telling her to go back to work. Ocheltree lost track of the number of times she tried to talk with Locklear, only to have Hirsch order her back to work. J.A. 123-24. Ocheltree summed it up this way: "[Hirsch] knew [that] I was going to go and tell [Locklear or Scollon about the men's behavior] because he would not go forward with it. He would tell me to get back to work, that if I had something ... to say to Bill or Ellery they would come to me and talk to me [and] that he would relay the message." Id.
 
 
 9
 After Ocheltree had no success in voicing her complaints through regular channels, she decided to speak up at a safety meeting for the production shop. She knew that a supervisor would be taking minutes, and she believed the minutes would be passed along to Scollon and Locklear. Ocheltree "addressed everyone," saying that "the sexual conduct, pictures, the gestures, the imitating of sex to mannequins and all that" should stop. J.A. 144-45, 203. The offensive conduct ceased for two or three hours, but then resumed with the same intensity. J.A. 203-04.
 
 
 10
 Her treatment at Scollon Productions left Ocheltree "embarrassed, humiliated, angered," and "totally down all the time." J.A. 127. She found it hard to be around groups of people and, as a result, stopped attending functions and activities that her two children were involved in. She has been on and off antidepressants. J.A. 125-26.
 
 
 11
 In April 1996 Ocheltree filed a complaint against Scollon Productions in the United States District Court for the District of South Carolina, asserting sex discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and South Carolina state law. The district court granted summary judgment to Scollon Productions, and Ocheltree appealed. We vacated the judgment on the hostile work environment claim, concluding that there were genuine issues of material fact as to the imputation of liability element of that claim. Ocheltree v. Scollon Prods., Inc., 161 F.3d 3 (table), 1998 WL 482783 (4th Cir.). Ocheltree's case went to trial after remand, and the jury returned a verdict in her favor, finding (in special interrogatories) that she had been subjected to a hostile work environment because of her sex. The jury awarded her $7280 in compensatory damages and $400,000 in punitive damages. The district court denied Scollon Productions' Rule 50 motion for judgment as a matter of law, but reduced the punitive damages to $42,720, bringing the total judgment in line with the $50,000 cap imposed by 42 U.S.C. § 1981(a)(b)(3)(A). Scollon Productions appealed, and a divided panel of this court held that the company was entitled to judgment as a matter of law because the offensive behavior directed at Ocheltree was neither because of her sex nor sufficiently severe or pervasive to constitute a hostile work environment. Ocheltree v. Scollon Prods., Inc., 308 F.3d 351 (4th Cir.2002). We vacated the panel decision and reheard the case en banc.
 
 II.
 
 12
 Scollon Productions argues that the district court erred in denying its Rule 50 motion for judgment as a matter of law because "there is no legally sufficient evidentiary basis" for the jury's verdict. See Fed.R.Civ.P. 50(a)(1). Our review is de novo. Anderson v. G.D.C., Inc., 281 F.3d 452, 457 (4th Cir.2002). We view the evidence (and recount it in part I) in the light most favorable to Ocheltree, the nonmovant, "draw[ing] all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." Id. Judgment as a matter of law is proper only if "there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 
 III.
 
 13
 Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). This provision "not only covers `terms' and `conditions' in the narrow contractual sense, but `evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment."' Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Title VII is violated "[w]hen the workplace is permeated with discriminatory [sex-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations and internal quotation marks omitted). To establish a Title VII claim for sexual harassment in the workplace, a female plaintiff must prove that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer. Spicer v. Va., Dep't of Corr., 66 F.3d 705, 710 (4th Cir.1995) (en banc); Anderson, 281 F.3d at 458. Scollon Productions does not dispute that Ocheltree proved the first element of her sexual harassment claim, unwelcome conduct. The company argues, however, that the evidence was insufficient to establish the other three elements of the claim. We will discuss each of these elements and the sufficiency of the related evidence.
 
 A.
 
 14
 The second element of the test requires proof that the offending conduct was based on the plaintiff's sex. This element comes straight from Title VII's "discriminat[ion]... because of ... sex" requirement. 42 U.S.C. § 2000e-2(a)(1). "`The critical issue [in the "because of sex" inquiry] is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" Oncale, 523 U.S. at 80, 118 S.Ct. 998 (quoting Harris, 510 U.S. at 25, 114 S.Ct. 367 (Ginsburg, J., concurring)). A woman may prove sex-based discrimination in the workplace even though she is not subjected to sexual advances or propositions. Smith v. First Union Nat'l Bank, 202 F.3d 234, 242 (4th Cir.2000); see also Oncale, 523 U.S. at 80, 118 S.Ct. 998. A trier of fact may reasonably find discrimination, for example, when a woman is the individual target of open hostility because of her sex, Smith, 202 F.3d at 242-43, or when "a female victim is harassed in such sex-specific and derogatory terms ... as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace," Oncale, 523 U.S. at 80, 118 S.Ct. 998.
 
 
 15
 The jury found specifically that Ocheltree's male coworkers engaged in the harassing conduct "because of [her] sex." Scollon Productions argues that the evidence does not support this finding because the conduct was not directed at Ocheltree (or at women in general) because of sex. The conduct was not directed at Ocheltree or women, the company says, because "it could have been heard [or seen] by anyone present in the shop" and "was equally offensive to some of the men." Appellant's Br. 18, 21. We conclude that the jury's "because of sex" finding is easily sustained. A reasonable jury could find that much of the sex-laden and sexist talk and conduct in the production shop was aimed at Ocheltree because of her sex — specifically, that the men behaved as they did to make her uncomfortable and self-conscious as the only woman in the workplace. Much of the conduct, a jury could find, was particularly offensive to women and was intended to provoke Ocheltree's reaction as a woman.
 
 
 16
 The disrespectful and degrading song that a coworker sang to Ocheltree in front of the men in the shop — "Come to me, oh, baby come to me, your breath smells like c[o]m[e] to me" — was by its words aimed at a woman. J.A. 115. On the occasion when some of Ocheltree's male coworkers were looking at the book with pictures of men with pierced genitalia, one of the coworkers decided to take advantage of Ocheltree's presence. With his male colleagues watching, the man took the book over to Ocheltree's work station, held up the centerfold photograph (showing a hoop-pierced scrotum and a chained penis) for her to see, and said, "Lisa, what do you think about this?" J.A. 117-18. No man in the shop was subjected to this same embarrassment, and no man there was called upon to offer a reaction to the photograph while the entire shop looked on. The sexual activity with the mannequin (from simulated oral sex to fondling) occurred repeatedly. Ocheltree's male coworkers did something sexual to the mannequin almost every time she was nearby. All of this conduct provoked much laughter from the men in the shop — laughter at Ocheltree's expense. J.A. 115-17, 200-03. Indeed, a jury could reasonably find that the men engaged in this conduct largely because they enjoyed watching and laughing at the reactions of the only woman in the shop.
 
 
 17
 The production shop talk that portrayed women as sexually subordinate to men was also calculated to disturb Ocheltree, a jury could reasonably find. We refer here to the almost daily accounts from some of the men who described their exploits with their wives and girlfriends in demeaning terms such as "she gave good head," "she likes to swallow," she "let[] [the semen] run down the side of her face," and "she like[s] it from behind." J.A. 120, 200. This kind of talk, as well as the sexual antics, got out of hand after Ocheltree's arrival in the production shop; it even escalated after she complained about it. It is true, as Scollon Productions points out, that at least a couple of the men were offended by the sexual talk and antics. There is no evidence, however, that this outrageous conduct was aimed at getting an embarrassed reaction from these men or that it was calculated to generate laughter at the expense of any man. No man was driven from the room because of the conduct, as was Ocheltree on occasion.
 
 
 18
 To sum up on this point, we conclude that a reasonable jury could find that Ocheltree was the individual target of harassment because of her sex. Moreover, a jury could find that the men in the production shop "harassed [Ocheltree] in such sex-specific and derogatory terms ... as to make it clear that [they were] motivated by general hostility to the presence of [a] wom[a]n in the [ir] workplace." Oncale, 523 U.S. at 80, 118 S.Ct. 998. In all events, a reasonable jury could find, as did the jury in this case, that Ocheltree was harassed in her workplace because of her sex.
 
 B.
 
 19
 The third requirement for a Title VII claim is proof that the harassment is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." Meritor Savs. Bank, 477 U.S. at 67, 106 S.Ct. 2399 (internal quotation marks omitted; alteration in original). The "severe or pervasive" element has both subjective and objective components. Harris, 510 U.S. at 21-22, 114 S.Ct. 367. Scollon Productions does not challenge the jury's finding that the harassment was "severe or pervasive to [Ocheltree] personally." Rather, the company argues that the evidence was insufficient to support the jury's finding that the harassment would have been "severe or pervasive to a reasonable person in [Ocheltree's] position." In deciding whether a jury could find that a work environment was objectively abusive, that is, abusive to "a reasonable person in the plaintiff's position," Oncale, 523 U.S. at 82, 118 S.Ct. 998, we consider all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23, 114 S.Ct. 367. This standard is designed to "filter out complaints attacking `the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting Barbara Lindemann & David Kadue, Sexual Harassment in Employment Law 175 (1992)). At the same time, the standard "protect[s] working women from the kind of male attentions that can make the workplace hellish for women." Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir.1995). See also Anderson, 281 F.3d at 459 (quoting Baskerville).
 
 
 20
 Here, a reasonable jury could find that, taken together, the various mannequin incidents, the vulgar song and picture, and the graphic descriptions of sexual activity (especially oral sex) that consistently painted women in a sexually subservient and demeaning light were sufficiently severe or pervasive to alter the conditions of Ocheltree's employment and to create an abusive work environment. After a time, Ocheltree was subjected every day to some variety of this offensive conduct, which was humiliating to her personally and to women in general. The harassment became so offensive at times that it drove Ocheltree from the room. It surely made it more difficult for her to do her job. A rational jury could find that a reasonable person in Ocheltree's situation would regard the work environment at Scollon Productions as abusive.
 
 C.
 
 21
 A Title VII plaintiff, for the fourth element of her claim, must prove that the harassment was imputable on some basis to her employer. In a case where an employee is sexually harassed by a coworker, the employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it. Spicer, 66 F.3d at 710; see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 759, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (noting that "[n]egligence sets a minimum standard for employer liability under Title VII"). In a case of harassment by a supervisor "with immediate (or successively higher) authority over the employee," an employer may be found vicariously liable under the standards established in Burlington Industries, Inc. v. Ellerth, 524 U.S. at 765, 118 S.Ct. 2257, and Faragher v. City of Boca Raton, 524 U.S. at 807-08, 118 S.Ct. 2275. Both the negligence and the vicarious liability theories were submitted to the jury in the special interrogatories, and the jury found in Ocheltree's favor on both theories. We limit our discussion to the negligence (or constructive knowledge) theory because the evidence is sufficient to support the jury's finding that Scollon Productions should have known that Ocheltree was being harassed by her coworkers.
 
 
 22
 An employer cannot avoid Title VII liability for coworker harassment by adopting a "see no evil, hear no evil" strategy. Knowledge of harassment can be imputed to an employer if a "reasonable [person], intent on complying with Title VII," would have known about the harassment. Spicer, 66 F.3d at 710. Under this rule an employer may be charged with constructive knowledge of coworker harassment when it fails to provide reasonable procedures for victims to register complaints. See, e.g., Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 441 (2d Cir.1999); Wilson v. Tulsa Junior Coll., 164 F.3d 534, 540-42 (10th Cir.1998). The question here, then, is whether a reasonable jury could find that Scollon Productions had constructive knowledge of Ocheltree's harassment because the company failed to provide adequate complaint procedures.
 
 
 23
 Scollon Productions claims that it has adequate complaint procedures that are set out in its sexual harassment policy. To begin with, it is debatable whether the company actually has a sexual harassment policy. No company document mentions sexual harassment, and there is no evidence that the company conducted any training to prevent sexual harassment. The company claims, however, that its "sexual harassment policy" is contained in two sections of its employee handbook. One section, entitled "Talking," says that "verbal abuse" of coworkers and supervisors is "not acceptable" and is "grounds for termination." J.A. 352. According to Bill Scollon, this is the company's prohibition of sexual harassment. J.A. 299-300. As to the channels for reporting harassment, the company points to another section of its handbook, entitled "Open Door Policy," J.A. 355, which states: "Anyone having a complaint or problem should first try to resolve it with their immediate supervisor. Ellery [Locklear] or Bill [Scollon] are usually available throughout the day to help resolve complaints or problems not resolved by supervisors." If this amounts to a sexual harassment policy, a jury could reasonably find that it fails to provide reasonable avenues of complaint.
 
 
 24
 The first problem with Scollon Productions' complaint procedure is that, by the company's own admission, it fails to place any duty on supervisors to report incidents of sexual harassment to their superiors. Bill Scollon acknowledges that a supervisor, such as shop supervisor Hirsch, has no duty under the open door policy to report sexual harassment complaints to either of the two persons with full management authority, Scollon himself or Ellery Locklear. J.A. 311. If a supervisor cannot or does not adequately resolve an employee's complaint, the employee has the responsibility of complaining to the company president or vice president. This approach seems ill designed to ensure that upper management learns of harassment. The victim must muster the courage to make a second complaint, and she may be more reluctant to register that complaint with a top company official. In any case, in deciding whether a company has reasonable complaint procedures, a jury may give negative weight to the fact that a scheme does not require a supervisor, with whom complaints of sexual harassment must be lodged in the first instance, to forward unresolved complaints to higher authority. See Wilson, 164 F.3d at 541-42.
 
 
 25
 The facts also show that Scollon Productions' procedure for employees to report sexual harassment complaints is deficient in another respect. Scollon Productions contends that under its "open door policy," Ocheltree had both the obligation and the opportunity to register her complaints with Scollon or Locklear. However, Ocheltree tried unsuccessfully to talk to Scollon and Locklear on numerous occasions. Her intent was to report the harassment. Ocheltree went to Scollon's office several times and asked if he had a minute to talk with her. Scollon told her repeatedly that he had no time and that she should "go see Mr. Locklear" or "go back to work." J.A. 123-24. Locklear was likewise never available to talk with Ocheltree. J.A. 123. In addition, Hirsch, the shop supervisor, knew that she planned to voice her complaints to Scollon or Locklear, and he actively tried to prevent her from doing so. According to Ocheltree, "[Hirsch] knew [that] I was going to go and tell [Locklear or Scollon about the harassment] because he would not go forward with it. He would tell me to get back to work, that if I had something... to say to Bill or Ellery they would come to me and talk to me [and] that he would relay the message." Id. Again, neither Scollon nor Locklear ever talked with Ocheltree. From this evidence, a jury could reasonably conclude that the company's "open door policy" was an illusion, at least so far as Ocheltree was concerned.
 
 
 26
 In sum, a reasonable jury could make the basic finding that Scollon Productions did not provide Ocheltree with reasonable avenues for voicing her sexual harassment complaints. In other words, Scollon Productions "did not exercise reasonable care in setting out the channels by which it could receive reports [of sexual harassment], and it is therefore in no position to rely on those inadequate channels to claim that it did not receive notice." Wilson, 164 F.3d at 542. Scollon Productions should have known about the harassment, as the jury found, and the company may be charged with knowledge because it did not provide reasonable avenues of complaint. The jury properly imputed the coworker harassment to Scollon Productions under the negligence (or constructive knowledge) theory.
 
 IV.
 
 27
 Scollon Productions also argues that there is no evidentiary basis for a reasonable jury to award punitive damages in this case. A Title VII plaintiff is entitled to punitive damages if her employer engaged in intentional discrimination "with malice or with reckless indifference to [the plaintiff's] federally protected rights." 42 U.S.C. § 1981a(b)(1). As the Supreme Court has said, "[t]he terms `malice' or `reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). To be liable in punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." Id. at 536, 119 S.Ct. 2118. There is not much to be said here. We have combed the record, and we find no evidence that would allow a jury to find that Scollon Productions knew, either directly or by imputation, that it might have been acting in violation of Ocheltree's "federally protected rights." As a result, the award of punitive damages must be set aside.
 
 V.
 
 28
 Because there is a legally sufficient evidentiary basis for a reasonable jury to find that Ocheltree was the victim of sex-based employment discrimination, we conclude that the district court correctly denied Scollon Productions' motion for judgment as a matter of law on her basic Title VII claim. The evidence, however, was not legally sufficient for a jury to find that Scollon Productions had the knowledge required to be liable for punitive damages. Accordingly, we affirm the judgment for the amount awarded in compensatory damages, and we reverse the judgment for the amount awarded in punitive damages.
 
 
 AFFIRMED IN PART AND REVERSED IN PART
 
 
 29
 NIEMEYER, Circuit Judge, concurring in the judgment:
 
 
 30
 This case presents the fortunately unusual circumstances in which the conditions in the entire workplace were coarse — indeed humanly degrading — and about which both male employees and Lisa Ocheltree appropriately complained. Because the basis of this workplace conduct for everyone centered on dirty jokes and allusions to sexual play and perversion, the majority has in my judgment taken it for discrimination by reason of sex and thus blurred the relevant issue. The majority reasons that this general condition of sexually-oriented baseness subjected Ocheltree to a hostile work environment that violated Title VII and the Meritor Savings Bank line of cases. See ante at 331-332. While the majority does point out that some of the workplace antics were focused more directly on Ocheltree than others to obtain her reaction as a woman, the number of such incidents appears to be limited to three. See ante at 332-333. The remainder of the conduct relied on by the majority must be characterized as general work conditions that both males and Ocheltree experienced. The majority fails to explain how these generally coarse conditions discriminated against one person or against one sex.
 
 
 31
 The dissenting opinion has, in my judgment, advanced the proper analysis of Title VII, focusing on discrimination and pointing out that the generally ugly atmosphere, albeit normally unacceptable, did not violate Title VII because these general conditions did not discriminate. See post at 338. For these reasons noted by the dissent, I cannot agree with the majority's analysis.
 
 
 32
 I am still left, however, with the existence of the three incidents of which both the majority and the dissenting opinion agree were focused on Ocheltree because she was a woman. These three incidents taken in isolation, without any offensive background conduct, most likely were insufficiently pervasive to alter the terms and conditions of Ocheltree's workplace. See Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 754 (4th Cir.1996) (holding that a few sexually discriminatory incidents "spread over seven years with significant time gaps between incidents" was not sufficiently severe or pervasive to be actionable). But the presence of the background conduct based on sexual perversion leads me to believe that we cannot take the three incidents in isolation. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed"). The discriminatory impact of the three incidents in my judgment was heightened by the force of the sexually-based background conduct, and therefore, on reflection, I believe that a jury could legally find that Ocheltree was the victim of unlawful discrimination.
 
 
 33
 Thus, while I firmly concur in the dissenting opinion's interpretation of Title VII, my review of the facts in the peculiar circumstances of this case leads me to conclude that the jury's verdict on liability should be affirmed. For this reason, I concur only in the judgment.
 
 
 34
 With respect to punitive damages, I agree that they must be vacated.
 
 
 35
 WILLIAMS, Circuit Judge, dissenting in part and concurring in the judgment in part:
 
 
 36
 In all candor, I share with my colleagues the personal preference that all people treat each other with respect and decency, in and out of the workplace. My disagreement with the result reached by the majority should in no way be interpreted as condoning the deplorable behavior exhibited by the employees of Scollon Productions. The question, I submit, is whether we, as federal judges, should devise our own policy or follow that which was clearly expressed by Congress in Title VII. The answer is clear: "[o]ur compass is not to read a statute to reach what we perceive — or even what we think a reasonable person should perceive — is a `sensible result'; Congress must be taken at its word unless we are to assume the role of statute revisers." Bifulco v. United States, 447 U.S. 381, 401, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980) (Burger, J., concurring). "Our duty, to paraphrase Mr. Justice Holmes in a conversation with Judge Learned Hand, is not to do justice but to apply the law and hope that justice is done." Id. at 402, 100 S.Ct. 2247 (citing The Spirit of Liberty: Papers and Addresses of Learned Hand 306-307 (Dilliard ed.1960)). Congress has proscribed gender-motivated discrimination in the workplace, not immorality, vulgarity, or disrespect. With all respect to my esteemed colleagues, I cannot agree that this jury verdict can be sustained by simply recounting various types of vulgarity and then concluding ipse dixit that such behavior constituted gender-motivated discrimination. Because I believe the majority's opinion reflects a fundamental misconception of the meaning of "discriminat[ion] ... because of ... sex" and effectively insulates the district court's denial of the motion for judgment as a matter of law from meaningful appellate review, I respectfully dissent from the majority's decision to affirm the compensatory damages award. I concur in the majority's judgment that the punitive damages award must be reversed.
 
 I.
 
 37
 A court should render judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on thatissue." Fed.R.Civ.P. 50(a)(1); see also Weisgram v. Marley Co., 528 U.S. 440, 448, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000) ("[Rule 50(a)] allows the trial court to remove cases or issues from the jury's consideration when facts are sufficiently clear that the law requires a particular result." (internal quotation marks and citation omitted)). "While we are compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them, we are not a rubber stamp convened merely to endorse the conclusions of the jury, but rather have a duty to reverse the jury verdict[] if the evidence cannot support it." Price v. City of Charlotte, 93 F.3d 1241, 1250 (4th Cir.1996) (internal citations omitted). "Judgment as a matter of law is proper when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." Id. at 1249 (internal quotation marks and citation omitted).
 
 II.
 
 38
 To determine whether there is a legally sufficient evidentiary basis to sustain the jury's verdict, I begin with the text of Title VII. Title VII makes it an "unlawful employment practice for an employer ... to fail or refuse to hire or to discharge ... or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C.A. § 2000e-2(a)(1) (West 1994). Because the workplace environment is one of the "terms, conditions, or privileges of employment," see Meritor Sav. Bank v. Vinson, 477 U.S. 57, 64-67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), a plaintiff may establish a violation of Title VII by proving that "discriminat[ion] ... because of ... sex" has created a hostile or abusive work environment, see id. at 66, 106 S.Ct. 2399. As the majority explains, to make out a hostile work environment claim, the claimant must prove: (1) that the subject conduct was unwelcome; (2) that the plaintiff was "discriminate[d] against ... because of [her] sex"; (3) that the gender-motivated discriminatory behavior was sufficiently severe or pervasive to create an abusive working environment; and (4) that some basis exists for imputing liability to the employer. (Maj. Op. at 331.) Scollon Productions contends that the evidence was insufficient with respect to elements (2), (3), and (4). I will address elements (2) and (3) in turn.
 
 A.
 
 39
 Notably, "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at `discriminat[ion]... because of ... sex.'" Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 676 (7th Cir.1993) (noting that there would be no cause of action for race discrimination under Title VII for a "daily routine of race-neutral verbal abuse"). Thus, a pervasively hostile or abusive atmosphere does not create a cause of action for sexual harassment under Title VII unless the plaintiff is able to show discriminatory treatment because of sex. Meritor Sav. Bank, 477 U.S. at 66, 106 S.Ct. 2399 ("[C]ourts have uniformly held, and we agree, that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment."). "[W]orkplace harassment, even harassment between men and women, is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations." Oncale, 523 U.S. at 80, 118 S.Ct. 998. "`The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring)). Stated another way, "would the complaining employee have suffered the harassment had he or she been of a different gender?" Hopkins v. Balt. Gas & Elec. Co., 77 F.3d 745, 750 (4th Cir.1996) (quoting Bundy v. Jackson, 641 F.2d 934, 942 n. 7 (D.C.Cir.1981)).
 
 
 40
 Based upon the foregoing principles, this court has consistently and correctly recognized that a finding of "discriminat[ion]... because of ... sex" depends not simply on identifying some quantum of harassing behavior to which an individual is exposed. Rather, the statutory language itself requires a showing that the harassing behavior constituted disparate treatment and that this disparate treatment was motivated by the plaintiff's gender. See Lack v. Wal-Mart, Inc., 240 F.3d 255, 260 (4th Cir.2001) ("This emphasis on discrimination as sex-differential treatment resonates throughout ... Oncale." (emphasis added)); id. at 261 (asking whether offensive comments were "animated by Bragg's hostility to Lack as a man"). In other words, there must be evidence that supports an inference that the harassing conduct is both "discriminat[ion]" and is "because of ... sex." See Oncale, 523 U.S. at 80-81, 118 S.Ct. 998; Smith v. First Union Nat'l Bank, 202 F.3d 234, 242 (4th Cir.2000) ("An employee is harassed or otherwise discriminated against `because of' his or her gender if,'but for' the employee's gender, he or she would not have been the victim of the discrimination.") (citing Wrightson v. Pizza Hut of America, Inc., 99 F.3d 138, 142 (4th Cir. 1996)).
 
 
 41
 Applying these principles here, I turn first to the question of whether the vulgar talk and antics detailed by the majority amounted to discrimination. With respect to the vast majority of vulgar talk and behavior upon which the majority relies, there is no suggestion that Ocheltree was subjected to any different treatment than that to which the other workers in the production shop were subjected. Tellingly, of the eleven men who worked in the production shop, three of them — Steve Zouras, John Riddle, and Brian Hodge — were offended by, and also complained about, the talk and behavior.[1] There is simply no evidence that Ocheltree was the "individual target" of the vulgar talk and behavior, as is suggested by the majority. (Maj. Op. at 332.) Indeed, giving Ocheltree the benefit of all reasonable inferences, only a minimal quantum of the vulgar behavior and antics could be perceived as having been aimed at her. For example, the vulgar song was sung directly to Ocheltree, and the book with pictures of pierced male genitalia was shown directly to Ocheltree.[2] (J.A. at 115, 117-18.) Additionally, there was one incident with a mannequin about which Ocheltree testified that could be perceived as having been targeted toward her in particular.[3] Setting aside these three incidents,[4] the remainder of the vulgar talk and behavior cannot reasonably be perceived as having been aimed or directed at Ocheltree in any way. The vast majority of the talk and behavior occurred in group settings as part of the male workers' daily bantering with one another and was overheard or witnessed by Ocheltree. Cf. Hopkins, 77 F.3d at 753-54 (finding that the harassing conduct was "often not directed specifically at [the plaintiff]" because "several of the incidents upon which Hopkins relies occurred in group settings"); White v. Fed. Express Corp., 939 F.2d 157, 160 (4th Cir. 1991) (noting that "[m]ost of the racist incidents detailed ... were not directed against plaintiff ..." (internal quotation marks omitted)). The uncontested evidence was that Ocheltree overheard most of the sexually explicit conversations because the men in the production shop "had to speak in a loud tone above all the equipment running and everything going." (J.A. at 201). Significantly, Ocheltree testified that Harold Hirsch would "always apologize if he knew [Ocheltree] could hear" what was being said. (J.A. at 146.) Ocheltree also testified that Jason Salvage and Barry Brown, two of the men who regularly engaged in the vulgar talk and behavior, "did not care what they said and to who they said it," (J.A. at 146). Thus, Ocheltree's own testimony confirms that much of the sexual talk and antics were not aimed at her.
 
 
 42
 My colleagues in the majority acknowledge that men were exposed to and offended by the sexual talk and antics, but they suggest that gender-motivated discrimination may be inferred because "[t]here is no evidence ... that [the] outrageous conduct was aimed at getting an embarrassed reaction from these men or that it was calculated to generate laughter at the expense of any man." (Maj. Op. at 332.) A review of the evidence, however, belies this assertion. For example, Ocheltree testified about an incident where Harold Hirsch told two male employees that he "would like to have sex with young boys." (J.A. at 119.) According to Ocheltree, this comment was said in front of Steve Zouras, who responded "that is enough, this cannot go on in here." (J.A. at 119.) Zouras's response immediately provoked laughter from the men. (J.A. at 119.) Thus, the uncontested evidence shows that the men "enjoyed watching and laughing at the reactions" of anyone who was offended by their childish and immature conduct, not that the men "enjoyed watching and laughing at the reactions of the only woman in the shop," (Maj. Op. at 332), as the majority concludes.
 
 
 43
 At bottom, the majority simply fails to acknowledge the uncontested evidence showing that the vulgar talk and behavior was experienced by, and equally offensive to, all of the production shop workers, irrespective of gender. In light of this evidence, Ocheltree is unable to establish that she was subject to any meaningful difference in treatment when compared to her co-workers. Lack, 240 F.3d at 262 ("Lack [a male plaintiff] fails to come to grips with the fact that female employees (including his original co-plaintiff Susan Willis) also lodged similar complaints regarding Bragg's behavior. This fact undercuts Lack's claim to a substantial extent."); id. ("In its totality, the evidence compels the conclusion that Bragg was just an indiscriminately vulgar and offensive supervisor, obnoxious to men and women alike."); Scusa v. Nestle U.S.A. Co., Inc., 181 F.3d 958, 965 (8th Cir.1999) ("Appellant admitted that Schoenfeld used profanity toward both male and female employees, and she believed that Lonnie would have reacted the same way had a male co-worker laughed at his mistakes."); Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir.1982) (holding that where a supervisor makes sexual overtures to employees of both genders, or where the conduct is equally offensive to male and female workers, the conduct may be actionable under state law, but it is not actionable as harassment under Title VII because men and women are accorded like treatment). Thus, the majority of the vulgar talk and antics trumpeted by the majority did not constitute discrimination.
 
 
 44
 Moreover, with regard to the second part of this inquiry, there is no evidence that this non-discriminatory vulgar talk and behavior occurred "because of" Ocheltree's sex. In fact, the uncontested evidence before the jury conclusively establishes otherwise. Zouras, who worked at Scollon Productions prior to Ocheltree becoming an employee, testified that "the same kind of conversations went on before [Ocheltree] came to work [at Scollon Productions] as after she arrived" and that it would be "fair to say there was no change in the atmosphere at the shop when [Ocheltree] arrived." (J.A. at 241-42.) Given that the behavior occurred prior to Ocheltree's employment with Scollon Productions, it follows a fortiori that the behavior could not have been motivated by her sex.[5]
 
 
 45
 Finally, my colleagues in the majority suggest that a jury could reasonably infer gender-motivated discriminatory treatment because Ocheltree was harassed "in such sex-specific and derogatory terms ... as to make it clear that the harasser [was] motivated by general hostility to the presence of women in the workplace." See Oncale, 523 U.S. at 80, 118 S.Ct. 998. While I do not condone the vulgar talk that frequently took place at Scollon Productions, I disagree that it could reasonably be perceived as so "sex-specific and derogatory" as to give rise to an inference of gender-motivated discriminatory treatment. At the outset, I note that the lewd, vulgar remarks had nothing to do with the presence of women in the workplace. The conversations about the men's sexual exploits simply described — albeit in graphic and lewd terms — heterosexual sex, including oral sex, between consenting adults.Oncale specifically instructs that comments do not amount to discriminatory sexual harassment simply because of their sexual content. Oncale, 523 U.S. at 80, 118 S.Ct. 998 (explicitly rejecting the proposition that harassment directed at plaintiff with sexual content automatically constitutes discrimination because of sex). On their face, the comments do not portray women in any negative or demeaning light. The sexual behavior described by the male co-workers is not by definition passive or subservient. Significantly, the comments do not suggest any abuse, control, or the use of force; the men were simply bragging about the sexual prowess of their partners. Further, in modern times, there is nothing particularly derogatory, demeaning, or subservient about a woman participating in consensual heterosexual sex. As women have sought and achieved sexual equality in this society, and as moral beliefs and taboos about oral sex have broken down, it seems illogical to assert that comments about consensual sex between adults necessarily imply male dominance or power.
 
 
 46
 To be sure, sexually explicit conversations could be so sex-specific and derogatory as to permit an inference of gender-related hostility. For example, if the conversations included unambiguous gender-related epithets, it would be permissible to infer that the vulgar behavior was intended to be discriminatory and was animated by hostility toward women. Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir.2001). No such conversations, however, were alleged here. Apart from the sexual content of the conversations, there is no nexus whatsoever between the conduct and Ocheltree's gender. To conclude that these conversations portray women in derogatory terms simply because they depict women engaging in consensual heterosexual sex would be, I believe, to misapply the Supreme Court's teaching on the relationship between sexual conversations and sexual harassment and to misunderstand modern societal views regarding women's sexuality. "[W]hile there are still people in this country, male as well as female, who are deeply offended by dirty words, employers are not under a legal duty enforceable by suits under Title VII to purify the language of the workplace." Carr v. Allison Gas Turbine Div., Gen. Motors Corp., 32 F.3d 1007, 1010 (7th Cir.1994) (citing Rabidue v. Osceola Refining Co., 805 F.2d 611, 620-21 (6th Cir.1986)).
 
 
 47
 In sum, after applying the appropriate analytical framework, it is clear that there is no legally sufficient evidentiary basis upon which the jury could have concluded that the majority of vulgar talk and behavior that took place at Scollon Productions amounted to gender-motivated discriminatory treatment.[6] Assuming arguendo that the three incidents that could be perceived as having been directed at Ocheltree (e.g., the vulgar song, the body piercing book, and the mannequin incident) amounted to gender-motivated discrimination, I next proceed to determine whether there is a legally sufficient evidentiary basis to support Title VII's third requirement for establishing a hostile work environment claim.
 
 B.
 
 48
 The third requirement for a Title VII claim is proof that the discrimination is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." Meritor Sav. Bank, 477 U.S. at 67, 106 S.Ct. 2399 (internal quotation marks omitted; alteration in original). "Not all sexual harassment that is directed at an individual because of his or her sex is actionable." Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 772-73 (4th Cir.1997) (citation omitted). "The `occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers' would be neither pervasive nor offensive enough to be actionable. The workplace that is actionable is the one that is `hellish.'" Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir.1997) (quoting Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995)).
 
 
 49
 The behavior here falls well short of that mark. As discussed above, the vast majority of the vulgar talk and behavior that occurred at Scollon Productions does not constitute "discriminat[ion] ... because of... sex." Of course, it is inappropriate to evaluate the severity or pervasiveness of non-discriminatory conduct for purposes of imposing liability under Title VII. Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("[W]hether an environment is sufficiently hostile or abusive is determined by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." (emphasis added and internal quotation marks omitted)); see also Hartsell, 123 F.3d at 772 (isolating gender-motivated discriminatory conduct and then evaluating whether such conduct was severe or pervasive). Even assuming that the few incidents that could be viewed as having been directed at Ocheltree during the year and a half that she was employed at Scollon Productions each amounted to gender-motivated discrimination, I have no difficulty concluding that these incidents were not severe or pervasive for purposes of Title VII as a matter of law. See, e.g., Hartsell, 123 F.3d at 773 ("But the claims propounded by Hartsell— even assuming them all to be true—are so trivial, so isolated, and so far from the paradigmatic case of sexual harassment, that summary judgment was clearly appropriate."); Hopkins, 77 F.3d at 754 (listing cases involving infrequent, isolated incidents in which we have held that harassment was not severe or pervasive as a matter of law). Because Ocheltree has failed to introduce sufficient evidence establishing the third element of her hostile work environment claim, the claim is not cognizable as a matter of law.[7]
 
 
 50
 In my good colleague Judge Niemeyer's separate opinion, he agrees, as he did initially as a member of the panel, that these three incidents, taken in isolation, were not severe or pervasive as a matter of law. He further agrees that virtually all of the vulgar talk and antics relied upon by the majority cannot reasonably be viewed as gender-motivated discrimination. Nevertheless, he now finds that the three incidents that arguably were directed at Ocheltree could be considered severe or pervasive upon consideration of this background, non-discriminatory conduct. I disagree.
 
 
 51
 Although it is true that determining the severity or pervasiveness of the gender-motivated discrimination requires careful consideration of the social context in which particular behavior occurs, Oncale, 523 U.S. at 81-82, 118 S.Ct. 998; Meritor Sav. Bank, 477 U.S. at 69, 106 S.Ct. 2399, this contextual analysis weakens — rather than bolsters — Ocheltree's sexual harrassment claim. For example, it is not severely or pervasively abusive for a coach to smack a professional football player on the buttocks as he heads on the field, "even if the same behavior would reasonably be experienced as abusive by the coach's secretary... back at the office." Oncale, 523 U.S. at 81, 118 S.Ct. 998. Similarly, the three isolated incidents of gender-motivated discrimination were not severe or pervasive, considering the coarse social context of the production shop where the background environment was and had been generally crude and vulgar, but non-discriminatory. See Gross v. Burggraf Construction Co., 53 F.3d 1531, 1537-39 (10th Cir.1995) (evaluating claim of gender discrimination in light of the profanity and vulgarity prevalent in "the real world of construction work").
 
 
 52
 A contrary conclusion would eviscerate the purpose underlying the severe or pervasive requirement by allowing sporadic instances of gender-motivated discrimination to give rise to Title VII liability. See Faragher, 524 U.S. at 788, 118 S.Ct. 2275. If non-discriminatory background conduct can somehow transform isolated incidents of discrimination into a severe and pervasive environment, its practical effect mirrors that of the majority — to avoid Title VII liability, employers will be forced to alter the workplace environment by eliminating the background, non-discriminatory conduct. When a non-discriminatory workplace environment is required to change because of the introduction of a female employee, Title VII has become a code of civility that requires that women be afforded preferential treatment beyond non-discrimination. I cannot agree that Title VII permits or sanctions such a result.
 
 III.
 
 53
 Finding that there is not a legally sufficient evidentiary basis to support the jury's verdict, I respectfully dissent from my colleagues' decision to affirm the compensatory damages award. I concur in the majority's judgment that the punitive damages award must be reversed.
 
 
 
 Notes:
 
 
 [1]
 John Riddle specifically testified that he did not know whether Ocheltree overheard the vulgar talk and did not believe that the talk or behavior was directed at her, and yet he complained about the conduct and language. (J.A. at 273-74, 279-80.)
 
 
 [2]
 The evidence shows that several of the men were looking at the book when one of the men took the book and held it up about "four feet away" from Ocheltree and said, "[w]hat do you think about this?" (J.A. at 117.) The uncontested evidence shows that Ocheltree later voluntarily looked at this book "by herself" while on break. (J.A. at 343.)
 
 
 [3]
 Although the majority discusses numerous incidents involving simulated sexual acts with mannequins, (Maj. Op. at 328-329), Ocheltree only testified about one such incident, (J.A. at 116-17). From Ocheltree's testimony about this one incident, and giving her the benefit of all reasonable inferences, a jury could conclude that it was staged for her benefit. Brian Hodge, a co-worker of Ocheltree's, testified that employees would regularly simulate sexually explicit acts on mannequins, but there is no legally sufficient evidentiary basis to conclude that Ocheltree was aware of these other incidents. To the extent that Ocheltree was not confronted with the other incidents about which Hodge testified, I question how the incidents could contribute to her hostile work environment claim
 
 
 [4]
 I have assumed arguendo that these three incidents are "discriminat[ion] ... because of... sex." I discuss in the next section why, even accepting that these three incidents satisfy the second element of Ocheltree's claim, the claim nonetheless fails as a matter of law
 
 
 [5]
 The majority suggests that the "misconduct worsened as time went on, especially after Ocheltree complained to the men and the shop supervisor, Harold Hirsch." (Maj. Op. at 328, 332.) The uncontested evidence is that any worsening in the conduct was experienced by all employees and that similar complaints were lodged prior to the worsening by Ocheltree's male co-workers. Thus, even viewing the inferences in the light most favorable to Ocheltree, the worsening of the conduct does not establish that Ocheltree was exposed to "disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed."Oncale, 523 U.S. at 80, 118 S.Ct. 998 (internal quotation marks and citation omitted). The conduct itself does not amount to gender-motivated discrimination; thus, the simple fact of its worsening cannot convert the otherwise vulgar but lawful conduct into "discriminat[ion]... because of ... sex."
 
 
 [6]
 Given the absence of a sufficient basis for concluding that this vulgar talk and behavior constituted gender-animated discriminatory treatment, the analysis and result crafted by the majority creates a rule requiring that women be given preferential accommodation in the workplace beyond non-discrimination. I view this as contrary to Title VII's statutory demand of equality, as well as contrary to the Supreme Court's and this court's instruction on gender neutrality in employment decisions. Moreover, I reject the notion that female workers are in need of "the protection of a preferential standard."DeAngelis v. El Paso Mun. Police Officers Ass'n, 51 F.3d 591, 593 (5th Cir.1995) (Jones, J.); see also Radtke v. Everett, 442 Mich. 368, 501 N.W.2d 155, 167 (1993) ("The belief that women are ... in need of a more protective standard ... degrades women and is repugnant to the very ideals of equality that [employment discrimination law] is intended to protect."); Margaret Talbot, Men Behaving Badly, N.Y. Times Magazine, October 13, 2002, at 52-55 (opining that a hostile work environment framework that is grounded in the assumption that the "presence of sexuality in the workplace, however motivated, is inherently threatening to women and prevents them from enjoying their work and succeeding on the same basis as men ... offers a paternalistic view of women as paradigmatic victims in need of protection from all forms of sexual expression").
 
 
 [7]
 Because I conclude that the gender-based conduct was not sufficiently severe or pervasive for Ocheltree to establish a prima facie case of sexual harassment under Title VII, I do not reach the questions of whether the conduct could be imputed to Scollon Productions or whether Scollon Productions is entitled to operation of theFaragher/Ellerth affirmative defense. Faragher, 524 U.S. at 807, 118 S.Ct. 2275; Ellerth, 524 U.S. at 765, 118 S.Ct. 2257. Moreover, insofar as Ocheltree failed to establish the essential elements of a sexual harassment claim, I concur with the portion of the judgment that reverses the district court's denial of Scollon Productions' motion to set aside the jury's award of punitive damages.