**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 05-1145

RONALD L. MASON,

Plaintiff - Appellant,

versus

WYETH, INCORPORATED, d/b/a Wyeth Consumer
Healthcare,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern
District of Virginia, at Richmond. Richard L. Williams, Senior
District Judge. (CA-04-410-3)

Argued: January 31, 2006                    Decided: May 31, 2006

Before WILKINS, Chief Judge, and MICHAEL and TRAXLER, Circuit
Judges.

Affirmed by unpublished opinion. Judge Traxler wrote the majority
opinion, in which Chief Judge Wilkins joined. Judge Michael wrote
an opinion dissenting in part and concurring in part.

**ARGUED:** Harris Dewey Butler, III, BUTLER, WILLIAMS & SKILLING,
P.C., Richmond, Virginia, for Appellant. Daryl Eugene Webb, Jr.,
TROUTMAN & SANDERS, L.L.P., Richmond, Virginia, for Appellee. **ON
BRIEF:** Laura G. Fox, Warrenton, Virginia; Tim Schulte, BUTLER,
WILLIAMS & SKILLING, P.C., Richmond, Virginia, for Appellant.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

TRAXLER, Circuit Judge:

Ronald L. Mason appeals the district court's order granting summary judgment to his employer, Wyeth, Inc., on his claims of discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. § 12101 et. seq. (West 2005) ("ADA"), and for intentional infliction of emotional distress under Virginia law. We affirm.

## I.

Mason has been hearing impaired since early childhood, with a total hearing loss of approximately 80 percent. With hearing aids, his ability to hear is improved between 80 and 90 percent, and he can participate in normal conversations. However, in areas where there is substantial background noise, Mason does not wear his hearing aids because the noise causes him to experience dizziness and headaches.

In November 1989, Mason was hired by Wyeth's predecessor in Richmond, Virginia, as an Offset Operator B in the Print Services Department (the "Department"). Wayne Samford was manager of the Department for the entire duration of Mason's nearly fifteen years of employment with Wyeth. In 1991, Mason received a promotion to Offset Operator A and, by all accounts, was a successful employee and highly skilled press operator who consistently received good performance evaluations.

3

Throughout Mason's employment, the employees in the Department got along very well on a personal level, and there was little turnover. When Mason was hired, there were seven employees in the Department – Mason, Samford, Nick Paravatti (supervisor), Otis Martin, Bill Branch, Allen Blankenship, and Rogers Jones. In the early to mid-1990s, Paravatti resigned, Martin was promoted to supervisor, and Ray Slaughter was transferred into the Department to operate the photocopiers. In January 2003, the employees in the Department consisted of six of the seven original employees (Mason, Samford, Martin, Branch, Blankenship, and Jones), plus Slaughter, who had been there for several years by that time. According to Mason, he considered these men to be his primary support network, he felt well-liked by his coworkers, and he felt that they always treated him as a person with normal hearing.

In approximately 1998 or 1999, the employees, and particularly Samford, began playing pranks on one another. One such prank involved Samford sneaking up behind the other employees to startle them, either by pinching or poking them, making hissing or loud noises, or blowing air on their hands with an air hose. Another involved Samford placing a toy rat in places where the employees would encounter it. It is undisputed that the pranks and tricks were not limited to those played by Samford on Mason. On the contrary, Samford played the same or similar pranks on nearly every employee in the Department. Mason also admits participating in the

4

prank-playing environment. For example, Mason admitted that he made everybody laugh by "mooning" traffic on Interstate 95 from the Wyeth parking lot on one occasion. He admitted placing a dead bug on top of a candy bar on Jones's desk to startle him, and he admitted startling Jones on another occasion by putting a rubber snake in his breakfast bag. According to Mason, Samford witnessed the latter incident, got the snake from Mason, and put it in Jones's sandwich box to startle him again. On yet another occasion, Mason attempted to pry open the door of a bathroom stall occupied by Jones. Mason testified that he was unsuccessful, but Jones realized that it was "me . . . trying to tease him," "caught me laughing and got me [the] next day." J.A. 63.

Mason also has a history of mental health problems that preceded his employment with Wyeth. In the 1980s, Mason was diagnosed with severe depression and was hospitalized for depression and suicidal thoughts. He has been treated by a psychiatrist for a Schizoaffective Disorder since 1997. In December 2002, Mason told one of his coworkers that he was considering suicide. When Samford learned about this statement, he discussed the matter with Mason, and relayed his concern to Betty Allen, Samford's immediate supervisor. Mason was placed in contact with Wyeth's employee health department, and referred to the Employee Assistance Plan ("EAP"). Pursuant to the EAP, Mason was referred to a clinical psychologist, Nancy MacConnachie. At no

5

time during this process did Mason attribute his depression and suicidal thoughts to his employment with Wyeth, or to the prank-playing environment in the Department.

Dr. MacConnachie first saw Mason on January 13, 2003. By letter dated January 22, 2003, Dr. MacConnachie advised Shirley Hess (Wyeth's senior manager in Human Resources) that Mason was suffering from depression and post-traumatic stress disorder which Dr. MacConnachie attributed to the pranks that had been played by Samford on Mason. Dr. MacConnachie advised that "[b]ecause of his hearing impairment, Mr. Mason's startle response has a low threshold and causes him great distress, breaking his concentration on his work" and suggested that "Mason's coworkers would benefit from education regarding the impact of a hearing impairment on the startle response." J.A. 9-10. This was the first time that Mason or anyone on his behalf requested that the prank-playing be stopped because of the alleged effect it was having on his emotional condition. It was also the first notice anyone at Wyeth received of Mason's current claim that he considered Samford's prank-playing (when directed at him) to be discriminatory conduct based upon his hearing disability and that Samford's prank-playing was the cause of his escalating mental health problems.[1]

---

[1]Mason testified that several years earlier, when the prank-playing behavior was getting started, he told Samford to stop because it was "getting on [his] nerves," and told Martin that Samford should stop the pranks. J.A. 50. However, he testified that Samford "thought I was kidding" and "didn't think what I was

6

Upon receiving Dr. MacConnachie's letter, Hess, Allen, and Ned Netherwood (Senior Director of Administrative Operations in Wyeth's Consumer Healthcare Division in Richmond), met with Mason and assured him that the prank-playing would stop. They then met with Samford and Martin, separately, regarding the matter. Both men readily admitted that the Department employees, including Mason, joked and played pranks on one another frequently. However, they stated that they were not aware of any negative or unusual impact the prank-playing was having on Mason, and they denied that the pranks were in any way directed at Mason because of his hearing disability. Both men stated that they had no idea that Mason was upset about the pranks, that Mason was, in fact, a participant in the play, and that they never intended to upset him or otherwise cause him harm. According to Allen, Samford appeared "very surprised" that Mason was claiming that the activity had this effect on him "since it was a situation where they all had participated in that type of activity," Mason "had not said anything to them that it was bothering him," and "he too, participated in some of the activity." J.A. 176. Allen testified that she did not view the prank-playing "as singling Mr. Mason out

saying to him was serious." J.A. 50. Mason apparently took no further steps to stop the behavior or extricate himself from the prank-playing environment, and makes no claim that he ever informed management or his coworkers or supervisors that he believed the pranks were directed at him because of his hearing disability or that they were causing a deterioration of his mental health condition until after he was referred to Dr. MacConnachie.

7

particularly at that point," J.A. 178, but instructed Samford to stop the activity in the Department.

It is undisputed that Samford played no further pranks on Mason after that meeting. In September 2003, however, nearly seven months later, Mason told Hess that he was having a nervous breakdown. Although Samford had admittedly played no further pranks on Mason, Mason claimed that Samford had continued to tease other employees which upset him. He also claimed that Martin had startled him on one occasion.[2] Soon thereafter, Mason left employment on short-term disability and checked into a hospital for treatment. He never returned to active employment with Wyeth.

Prior to these events, Wyeth had begun the task of analyzing cost-saving strategies, including ways to reduce expenses in its Print Services Departments located throughout the company. Wyeth hired an outside consultant firm, the McKinsey Group, to analyze how costs could be reduced through outsourcing of various print service functions. By early January 2003, Jim Pohlman, the Executive Vice President located in Wyeth's corporate headquarters in Madison, New Jersey, informed Netherwood that offset printing would likely be discontinued because it could be done cheaper outside of the company. Netherwood immediately informed Samford

---

[2]Although Mason testified that he felt like Martin made a noise on purpose, he admitted that he did not see Martin do anything to cause the noise and did not know if it was done intentionally or not.

8

and Martin of the likelihood that a reduction-in-force ("RIF") would take place in the Department and they, in turn, informed all employees in the Department, including Mason, of the likely RIF. Mason testified that, although he was informed at this time of the proposed closure, he was not worried about it. On February 14, 2003, Netherwood presented to Pohlman the options available in Richmond under the McKinsey study and his recommendation that the company eliminate all offset press work, equipment and associated personnel.

A final decision to discontinue operation of the offset print presses in Richmond, Virginia and Madison, New Jersey, was made later that year, with the formal announcement occurring on September 23, 2003. The offset presses were removed from the Richmond location shortly thereafter. Because their primary job function was to operate the now-defunct offset presses, Mason and Blankenship were included in the RIF. The three remaining employees in the Department (Jones, Slaughter, and Branch) were transferred to a newly-created Copy and Mail Center, where they continued to perform the same job functions. Because this left only three non-management employees, the need for a manager and supervisor of the Department was also eliminated, resulting in the termination of Samford and Martin, effective November 30, 2003.[3]

---

[3]A simultaneous RIF in the Richmond RxPO department resulted in the termination of ten additional employees. The parties have not indicated the number of employees terminated as a result of the

9

On September 24, 2003, Mason was informed that his position was being eliminated. However, because Mason would turn 55 years old in March 2004, Netherwood and Wyeth's Assistant Vice President of Human Resources recommended that Wyeth postpone the effective date of Mason's termination for six months, until April 1, 2004, so that he would be eligible to retire and receive enhanced retirement benefits if he returned to active employment before that date. Mason and the others were also offered a separation program, which included severance, outplacement, educational assistance and benefit continuation. Mason never returned to work and continues to receive disability benefits.

Mason filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination and retaliation under the ADA. He then filed this action, asserting claims for hostile work environment and retaliation under the ADA, and for intentional infliction of emotional distress under Virginia state law. Wyeth moved for summary judgment, which was granted by the district court, and this appeal followed.

## II.

We begin with Mason's claim that the district court erred in granting summary judgment on his hostile work environment claim and

---

reorganization at the Madison, New Jersey location.

in determining that Mason had failed to plead a separate "reasonable accommodation" claim under the ADA.

A.

"The ADA prohibits discrimination only against a 'qualified individual with a disability,' and defines such a person as 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions' of his job." Fox v. General Motors Corp., 247 F.3d 169, 177 (4th Cir. 2001) (internal citations omitted) (quoting 42 U.S.C.A. § 12112(a) and § 12111(8)).

In his amended complaint, Mason set forth three specifically enumerated counts: Count One, labeled "Americans with Disabilities Act (Hostile Work Environment)"; Count Two, labeled "Americans with Disabilities Act (Retaliation)"; and Count Three, labeled "Intentional Infliction of Emotional Distress." J.A. 134-136. Wyeth moved for summary judgment as to all three counts.

During the summary judgment proceedings before the district court, a controversy arose regarding whether Mason had stated a "reasonable accommodation" claim under § 12112(a), separate and apart from his claim of a "hostile work environment." Specifically, Mason argued that he had and, in particular, claimed that Wyeth had violated the ADA by failing to provide him with a TTY-adapted telephone and by failing to provide either sign

11

language interpreters or written summaries of semi-annual meetings to ensure that he was aware of new information. The district court ruled that Mason had failed to plead a separate "reasonable accommodation" claim in his amended complaint, and granted summary judgment as to Mason's "hostile work environment" claim. We agree.

As an initial premise, we note that Mason clearly failed to set forth a separately stated count for an alleged failure to provide reasonable accommodations for his hearing disability. He does not claim otherwise on appeal. Rather, he asserts that he should be allowed to pursue such a claim because it was sufficiently stated in the paragraphs leading up to the enumerated counts, which, in turn, were incorporated by reference into his first count for hostile work environment. In these paragraphs, Mason set forth factual allegations regarding the prank-playing environment, followed by allegations that "[o]ther acts . . . contributed to the hostile environment/harassment," J.A. 130, including Wyeth's failure to provide "reasonable accommodation in the form of an interpreter" or "written summaries of the department meetings, so he could learn what topics had been discussed," J.A. 131. Mason also alleged that Wyeth had "further discriminated against Mason when it gave him a lower performance evaluation because of his difficulties in answering the telephone at work. The telephone at the printing department was not a TTY-adapted

12

telephone, and Defendant continuously ignored Mason's requests for accommodation in this and other regards." J.A. 131.

We disagree with Mason's view that these background allegations were sufficient to state a separate count for reasonable accommodation. Mason structured his amended complaint to allege, via clearly delineated headings, three specific, enumerated counts. At best, a fair reading of the amended complaint should have placed Wyeth on notice that Mason considered these supposed failures to be a part of his claim that the work environment was hostile to him because of his hearing disability, and therefore something to be considered in conjunction with Samford's prank-playing. But it did not fairly place Wyeth on notice that Mason was claiming that such accommodations would have allowed him to "perform the essential functions" of his job," 42 U.S.C.A. § 12111(8), and that he intended to pursue a separate count for failure to accommodate.

Even if the amended complaint had sufficiently placed Wyeth on notice of a reasonable accommodation claim, however, it would not affect Wyeth's entitlement to summary judgment on the ADA count. Prior to the filing of the motion for summary judgment, the parties conducted discovery and Mason was given ample opportunity to produce evidence in support of any such claim. Yet, Mason has failed to support his allegations that he requested and was denied the specified accommodations with sufficient evidence, and has

13

failed to demonstrate that he was unable to perform the essential functions of his job without them.

With regard to Mason's alleged request for a sign-language interpreter, Mason testified that, within a year or two of coming to work, he realized that he was having trouble hearing in the semi-annual meetings and he "hint[ed] . . . to Otis and Wayne" that he needed an interpreter. J.A. 92. According to Mason, he was encouraged to sit in the front of the meetings and turn his hearing aids up. Mason testified that he heeded this advice, but still encountered too much background noise to hear well. Mason admits that he only "hinted" of the need for an interpreter on this one occasion, and he apparently told no one that the suggested resolution was unsatisfactory. Rather, Mason testified that he did not believe he needed to say anything else, that Wyeth should have "immediately" provided an interpreter in response to his hint, and that he "just gave up." J.A. 94.[4] Such evidence is plainly insufficient to support a finding that Wyeth failed to make a reasonable accommodation under the ADA.

Mason's testimony regarding his difficulties with the telephone and its alleged impact on his job is a similarly insufficient basis upon which to ground a reasonable accommodation

_____

[4]There is no admissible evidence that Mason ever requested written summaries of the meetings, as alleged in his complaint. He did not claim that he did in his testimony, and the only mention of the alleged request in the record is a hearsay statement recorded by Dr. MacConnachie in her letter to Wyeth.

14

claim.  Mason testified that Samford informed him on one occasion that Mason was not taking telephone messages accurately, prompting him to request "something like a sound booster" for the telephone. J.A. 96.[5]  Mason testified that the only accommodation he requested was this "volume enhancer or amplifier on the telephone" and admitted that this "was done and that [it] helped" him.  J.A. 97. He later testified, without elaboration, that he also "asked [Betty Allen] about TTY, and they never provided it."  J.A. 98.  However, because Mason has also failed to come forward with any evidence that a TTY-adapted telephone was required for him to perform his essential job functions, we need not resolve any conflict in Mason's testimony in this regard.  To the extent any evidence on the matter was produced, it indicates that Mason was performing his job duties, including answering the telephone, satisfactorily with the accommodation provided.

---

[5]In his amended complaint, and in arguments before us, Mason characterizes this comment on Samford's part as a lower performance appraisal which resulted from Wyeth's failure to provide a reasonable accommodation.  Mason alleged that he "disagreed with the lower performance evaluation and initially refused to sign it," that he "was told by Samford that if he did not sign the evaluation he would not get a pay raise," and that he "asked for a copy of the evaluation, [but] his request was denied."  J.A. 131.  Mason has produced no evidence in support of these additional allegations and his own testimony does not support them.  Indeed, there is no evidence of a written evaluation regarding Mason's telephone abilities at all, and the only written evidence regarding Mason's performance evaluations is overwhelmingly positive.  To the extent we could view Samford's comment as a lower performance appraisal, however, it obviously did not result from Wyeth's failure to provide a TTY telephone, as it preceded Mason's request for the voice amplifier that was provided.

15

In sum, we agree that Mason's amended complaint failed to allege a separate claim for "failure to accommodate" under the ADA and, therefore, affirm the district court's ruling. We also hold that, even if Mason had sufficiently stated such a claim, Wyeth remained entitled to summary judgment because Mason's evidence is plainly insufficient to support his claim that the accommodations were requested and denied, or that they were necessary for him to perform his essential job functions.

## B.

We next turn to Mason's claim that Samford's prank-playing amounted to a hostile work environment in violation of the ADA. The ADA prohibits employers from "discriminat[ing] against a qualified individual with a disability <u>because</u> <u>of</u> the disability of such individual in regard to [the] terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a) (emphasis added). In order to establish such a claim for discrimination based upon a work environment that is hostile to one's disability, the plaintiff must prove that "(1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to

16

impute liability for the harassment to the employer."  Fox, 247 F.3d at 177.

We agree with the district court's determination that Mason failed to create a genuine issue of material fact which could satisfy the third element, i.e., that Samford discriminated against Mason "because of" Mason's hearing disability.[6]

The critical issue for consideration in the "because of" inquiry is whether a disabled plaintiff has been "exposed to disadvantageous terms or conditions of employment to which [non-disabled employees] are not exposed."  Ocheltree v. Scollon Productions, Inc., 335 F.3d 325,  331 (4th Cir. 2003) (en banc) (internal quotation marks omitted) (addressing the "because of" inquiry in the context of a Title VII sex discrimination case). Here, it is undisputed that the employees in the Department had worked together for a long period of time and were close friends as well as coworkers.  While Samford may have led the pack in the prank-playing shenanigans that developed among the men, it is undisputed that Samford was not the only participant, nor was Mason his sole target.  Samford played these exact pranks on most, if not all, of Mason's coworkers, and all of the employees participated in

---

[6]We express no opinion as to whether the prank-playing could be viewed as sufficiently severe or pervasive to alter a term, condition, or privilege of employment.  Because Mason failed to demonstrate that any alleged discrimination occurred "because of" his hearing disability, it is unnecessary for us to reach the alternative holding of the district court on the fourth element.

17

the prank-playing in some fashion and degree. Mason admits this and, while he attempts to downplay the extent and degree of his involvement, he admits that he engaged in similar horseplay. And, like Samford, Mason viewed his antics as innocent and, for the most part, welcomed by his targets. In short, the work environment in the Department was permeated with the perhaps sophomoric and juvenile behavior of its employees.

Unable to show that Samford singled him out from his coworkers for the pranks, Mason instead claims that it was sufficient to produce evidence that he was the primary target of Samford's prank-playing antics. According to Mason, he felt like he was Samford's primary target, and he believes this is because he was easy to sneak up on and has a low-threshold startle response. Because these characteristics resulted from his hearing impairment, Mason asserts that one may infer that Samford's prank-playing, when directed at him, amounted to discrimination against him because of the hearing disability in violation of the ADA.

We are unpersuaded. First, Mason has produced insufficient admissible evidence from which one could conclude that he was even the "primary" target of Samford's prank-playing, as opposed to only one of several "favorites" in the Department.[7] Second, while Mason

---

[7]Mason testified that he believed he was the primary target, that Slaughter was second, and that Blankenship was third. Slaughter testified that he felt like he was Samford's primary target, and that Samford played more pranks on him than on Mason. The testimony of the employees in the Department supports both

18

presented lay testimony regarding his supposed "exaggerated" or "low threshold" startle response, he has not designated and produced expert testimony to support a causal connection between the degree of his startle response and his hearing disability, or evidence that his startle response was really all that different from that of Samford's other primary targets.

In the end, however, we hold that Mason cannot prevail on his hostile work environment claim under the ADA based upon such a multi-layer approach of imputing a discriminatory motive to Samford.  In order to establish a claim under the ADA, Mason was required to present evidence upon which a jury could rest a determination that Samford <u>discriminated</u> against Mason <u>because</u> <u>of</u> his hearing disability.  That is what the ADA and other such anti-discrimination laws are intended to prevent -- discrimination against an employee because of the protected trait at issue.  They

viewpoints, as well as the possibility that Blankenship was at least Samford's third favorite target.  Of course, all such rankings are too subjective and generalized to be of much assistance to Mason.  They are necessarily based upon the subjective impressions of the employees and the frequency with which they were in position to observe the behavior.  The employees, including Mason, do agree on one thing; Samford played the most pranks on Slaughter, Blankenship, and Mason because they were accessible and had "funnier" reactions, in contrast to Branch, Jones and Martin, who, either because they were not as accessible in their work stations or had little or no reaction to the pranks, had fewer pranks played upon them.  We find Mason's subjective and self-serving declaration that he was "first" simply too thin a reed upon which to rest the claim that he was "singled out" from the others and subjected to "disadvantageous terms or conditions of employment to which" his nondisabled coworkers were not exposed. <u>Ocheltree</u>, 335 F.3d at 331 (internal quotation marks omitted).

19

do not intended to guarantee "refinement and sophistication in the workplace."  Cf. Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 773 (4th Cir. 1997).  Nor are they intended to subject an employer to liability because the mutual prank-playing of friends and coworkers in the workplace gets out of hand and inadvertently offends or harms one who happens to a disability.

In this case, there is no evidence that Samford was ever motivated to discriminate against Mason because Mason was hearing impaired.  Mason does not claim that he alone was singled out.  He readily acknowledged that Samford "d[id] it all the time.  I'm not the only person . . . .  He does it to all the others."  J.A. 49. He also admitted that Samford never said anything that caused him to believe that he was being teased "because [he was] hearing impaired," J.A. 69, and testified that Samford "never made fun of [his] hearing," J.A. 70.  He, and the others in the Department, viewed Samford's pranks as "just . . . a joke."  J.A. 47, 50.  When specifically asked to identify the people at work who he believed were motivated to tease him or play tricks on him because of his hearing impairment, Mason denied that he was teased because of his hearing impairment.  Rather, he believed that he was teased because he was a "good all around role model and offset pressman."  J.A. 66.  According to Mason, "[t]hey just like[d] to pick on me" because "I was [a] swell of a guy."  J.A. 66.

Indeed, Mason testified that he did not consider the prank-playing to be harassment based upon his hearing disability until his medical providers told him otherwise. Mason testified that he "didn't look at it that way because of [his] hearing disability, but [his] doctor look[ed] at it that way and told [him]." J.A. 55. He was also told in "the group meetings when [he] was in the hospital . . . that [it] is harassment, that [he] didn't know. And [he] just held it as a joke, and no one told me it was harassment. . . . J.A. 47. As a result, Mason came to believe that Samford's pranks were "harassment," not because he believed Samford held any discriminatory animus towards him or his disability, but because his medical providers told him that Samford was so motivated.[8]

In sum, Mason makes no claim that Samford was directly motivated by a discriminatory animus towards him. Samford denies any such animus or motivation, and there is no other testimony or evidence that would allow such an inference. Mason cannot prevail because he failed to present sufficient evidence to establish that

---

[8]Even if the opinions of the medical providers had been offered as expert testimony, an opinion that Samford's pranks were discriminatory in nature would not be the proper subject of a medical opinion. We note, however, that the medical providers appear to have been under the incorrect impression that the only harassing conduct taking place was that of Samford playing "sneaky" tricks on Mason. Mason does not make that claim, and it is not supported by the evidence.

Samford subjected him to a discriminatory, hostile work environment because of his hearing disability.

## C. Retaliation

Mason's next claim is that he was terminated by Wyeth in retaliation for his complaints about Samford's prank-playing, also in violation of the ADA. See 42 U.S.C.A. § 12203 (providing that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter").

To establish a prima facie case of retaliation, Mason was required to present evidence that (1) he "engaged in conduct protected by the ADA;" (2) he "suffered an adverse action subsequent to engaging in the protected conduct;" and (3) "there was a causal link between the protected activity and the adverse action." Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 216 (4th Cir. 2002). Although Mason was not required to establish that the opposed conduct was actually an ADA violation, he must at a minimum establish a reasonable, good faith belief that the opposed conduct violated the ADA. See id.

Mason cannot prevail on his retaliation claim because he failed to create a genuine issue of material fact that he was

terminated as a result of his complaints, rather than as part of the scheduled RIF. As noted earlier, Wyeth began studying ways to reduce expenses in its Print Services Departments in early 2002 and, by early January 2003, its consultant had completed its study in this regard. The Richmond and Madison print departments were targeted for closure, and a RIF and reorganization were formally announced in September. The offset presses were removed and, Mason and Blankenship, whose primary job functions were to operate those offset presses, were terminated, along with a number of additional employees.

In light of this undisputed evidence, the district court held that Mason had failed to create a genuine issue of material fact that Wyeth's stated reason for terminating Mason was pretextual, or that the termination was otherwise imposed as retaliation for Mason's complaints of Samford's prank-playing antics. We agree, and affirm the district court's grant of summary judgment on this claim for the same reason.

III.

Lastly, we turn to Mason's claim that he presented sufficient evidence that Samford's pranks amounted to intentional infliction of emotional distress under Virginia law. We disagree.

The tort of intentional infliction of emotional distress requires that the plaintiff prove (1) that "the wrongdoer's conduct

23

was intentional or reckless;" (2) that "the conduct was outrageous and intolerable;" (3) that "there was a causal connection between the wrongdoer's conduct and the emotional distress;" and (4) that "the emotional distress was severe." See Harris v. Kreutzer, 624 S.E.2d 24, 33 (Va. 2006). "Because of the risks inherent in torts where injury to the mind or emotions is claimed, . . . such torts [are] not favored in the law." Ruth v. Fletcher, 377 S.E.2d 412, 415 (Va. 1989) (internal quotation marks omitted). Indeed, in establishing the requisite "outrageousness" of the conduct, it is not enough to show that the defendant "acted with an intent which is tortious or even criminal." Harris, 624 S.E.2d at 33 (internal quotation marks omitted). Rather, liability may be "found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (internal quotation marks omitted).

Mason claims that Samford's pranks rose to this level, in large part because he was an especially susceptible and vulnerable target. Like the district court, we are unpersuaded. Viewing the evidence in the light most favorable to Mason, the conduct at issue, while perhaps inappropriate for the work environment, amounted to little more than sophomoric pranks between good friends and coworkers. As such, it falls far short of the requisite outrageous and atrocious behavior necessary to pursue a claim for

24

intentional infliction of emotional distress.  Accordingly, we affirm the district court's grant of summary judgment as to this count as well.

                                    IV.

     For the foregoing reasons, we affirm the district court's grant of summary judgment in its entirety.

                                                    <u>AFFIRMED</u>

25

MICHAEL, Circuit Judge, dissenting in part and concurring in part:

I respectfully dissent from the majority's decision in part II.B to affirm summary judgment for Wyeth, Inc. on Ronald Mason's hostile work environment claim under the Americans with Disabilities Act (ADA). The majority erroneously concludes that Mason's claim fails because Wyeth's manager Wayne Samford did not harass Mason because of his deafness. When the facts are taken, as they must be, in the light most favorable to Mason, they reveal that Samford relentlessly took advantage of Mason's deafness in playing pranks on him to provoke his extreme "startle reaction." Far from being mere horseplay, these incessant pranks ultimately led to a deterioration in Mason's mental health and made his work environment a hostile one.

I.

In 1989 Ronald Mason began working as an offset printer operator in the print services department of A.H. Robins Company, Inc., a Richmond, Virginia, concern that later became part of Wyeth. Samford and Otis Martin were Mason's supervisors during most of Mason's employment, including the period relevant to this case. Mason, who is deaf, was a highly skilled employee. He did not usually wear hearing aids at work because using them in the noisy work environment caused dizziness and headaches.

26

Although Mason's coworkers liked him and treated him like a "normal hearing person" in many ways, they were generally clueless about and indifferent to his disability. J.A. 42. As Mason put it, "They don't understand about my hearing disability." Id. Mason's managers likewise were indifferent to his deafness. For example, Mason requested a sign language interpreter early in his employment so that he could follow the discussion and participate in group meetings, but Samford and Martin never provided one. Mason explained to Samford and Martin that he "[could not] understand a word" at the meetings. J.A. 92. Mason specifically said to them, "I need [an] interpreter," and asked, "Can someone see . . . about getting an interpreter?" J.A. 92, 94. Samford and Martin just responded, "Turn your hearing aid up. Get up in front." J.A. 92. As a result of this indifference, Mason did not have access to the same workplace information that his hearing coworkers did. Whenever Mason wore his hearing aids at work, Samford would expect Mason to function at all times as "a hearing person," but Mason obviously could not. J.A. 44. For instance, even when wearing his hearing aids, Mason could not understand voices on the telephone because his hearing aids distorted the sound. Disregarding this problem, Samford criticized Mason for not taking phone messages correctly. At times Mason's coworkers would speak to Mason in a belittling way about his disability, saying, "You hear what you want to

hear." J.A. 42. This accusation, Mason insisted, was not true. In addition, one coworker, Ray Slaughter, mocked Mason's impaired speech.

In 1998 or 1999 Samford began playing pranks on Mason that were both cruel-hearted and discriminatory because they exploited Mason's deafness. As often as two or three times a week, Samford would sneak up behind and pinch Mason while making a hissing noise or blowing air from an air hose onto Mason's hand. As Mason described the incidents:

> I hear the sound, psst, and he touch me like a snakebite, yes, but I didn't hear him approach me, behind me. I can't hear him . . . . My job is focus on work. If I hear, I will turn around. I would prevent it. The advantage is I can't hear him, and it's so easy for him — I was so target, easy to be attacked, because I jump. I jump my legs. And he laughed, think it's funny, because I overreacted.

J.A. 49-50. In addition, Samford would often hide a rubber rat in the work area to shock Mason. Mason estimates that Samford scared him with the rat at least twenty-five times in one year. Samford used the rat on occasion to scare other print shop employees, but Mason was his most frequent prey.

Although Samford played pranks on other employees, Mason was Samford's "number one target" because Mason's disability made it easy for Samford to sneak up behind him and provoke a severe startle reaction. J.A. 55. Mason explained, "[M]y nerve is very jumpy. And anybody touch me, I jump . . .

28

because the deaf people, if you tap behind deaf people, what happen? It causes deaf people to startle.  Deaf people prefer people come around in front where they can see, see you. I'm the same way."   J.A. 68-69.   Samford tormented Mason because he (Samford) was amused by Mason's reactions; Samford admits they made him laugh.  Mason's reactions also made Mason's coworkers laugh. According to Mason, Samford was motivated to scare Mason primarily because of Mason's startle reactions.

> [A]s being a hearing-impaired person, other than normal hearing person, you can hear him coming, and you don't usually scare as much as they are.  When you're impaired person, it's like I'm almost deaf and I'm working on machine and it's just — all my mind is staying on machine.  When unexpected startle or — I mean, I'm telling you, it scared the shit out of me, because there's a lot to do with hearing disability. It just made me — heart pounding, scaring. My face turned white, and I jump. Nobody jumps like I do.  It scares me to shit.  And Wayne [Samford] likes that, my action of being scared. He thinks it's funny. . . . [H]e kept on and on and on and on and on, never stopped.

J.A. 67-68.

Mason's coworkers confirmed that Samford targeted Mason with harassing conduct because of his disability.  Mason's coworker Judith Kounnas reported that Mason was an easier target for pranks than other employees because he could not hear. Mason's coworkers also confirmed that print shop employees did not reciprocate with pranks on Samford. See, e.g., J.A. at 251

29

(coworker Roger Jones stating, "You don't usually play tricks on the boss.").

"[M]ore than once, maybe several times," Mason pleaded with Samford to stop his "shit," explaining to Samford that his pranks were "getting on [Mason's] nerves." J.A. 50. Read in context, Mason's statement about his frayed nerves conveys more than mere annoyance: Samford's pranks were affecting Mason's nervous condition. (Samford was aware of Mason's condition and knew that Mason took medication to "calm [his] nerves." J.A. 69.) Samford ignored Mason's requests, however, forcing Mason to seek help from another person in management, Otis Martin. Mason reported Samford's harassment to Martin two times. He specifically asked Martin if he "would . . . tell [Samford] to stop." J.A. 47. Martin seemed to feel sorry for Mason; he told Mason that he knew Samford's conduct was wrong and that he would "see what he [could] do." J.A. 79-80. But nothing was done, and Samford's harassment persisted.

Samford's pranks caused Mason to suffer great anxiety and physical distress. Although Mason took additional medication to alleviate his anxiety, his job performance began to suffer. Mason would often lose his concentration and have trouble focusing and handling his tools. His work slowed. The harassment even caused Mason to incur minor physical injury at work. On occasion Samford's conduct would cause Mason to lose

30

his balance and skin his knuckles. Once Mason fell over and hurt his back.

In late 2002 Mason's anxiety became so severe that he began to contemplate suicide. He was referred to a psychologist, Dr. Nancy MacConnachie, who diagnosed him with post-traumatic stress disorder. In January 2003 Dr. MacConnachie wrote a letter to Shirley Hess in Wyeth's Human Resources Department. Dr. MacConnachie cited Samford's conduct as a source of Mason's emotional deterioration and emphasized that it was necessary to put an immediate stop to the "apparently discriminatory behavior in [Mason's] work place." J.A. 10. Hess responded about three weeks later by holding separate meetings with Mason, Martin, and Samford about the harassing conduct. At the meeting with Mason, held on February 13, 2003, Mason cried and explained why he was scared and depressed as a result of the pranks. Samford and Martin confirmed that the incidents had occurred.

II.

To establish a hostile work environment claim under the ADA, Mason must establish that (1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on (or because of) his disability; (4) the harassment was sufficiently severe or pervasive to alter

31

a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability to the employer. Fox v. General Motors Corp., 247 F.3d 169, 177 (4th Cir. 2001). The majority errs in concluding that Mason does not proffer sufficient facts to establish the third element, that he was harassed because of his disability.

A.

The majority contends that Mason was not harassed on account of his disability because Samford was not the only person in the print department who played pranks and because Samford played many of the same pranks on Mason's non-disabled coworkers. This contention suffers from two fatal flaws. First, Mason has produced sufficient evidence to allow a reasonable jury to conclude that he was the primary target of Samford's harassment. Mason testified that he was subjected to pranks more frequently than others in the department. Mason also testified that we was the "number one target" for Samford's pranks because he was easy to sneak up on and because his startle reaction was extreme. Mason's coworker, Judith Kounnas, corroborated this account. Even Samford's testimony, taken as a whole, would allow a jury to infer that he targeted Mason: Samford surprised Mason with his pranks more often than any other employee because he found Mason's extreme startle reaction amusing. Moreover, the type of

32

pranks Samford played specifically exploited Mason's inability to hear and his exaggerated startle reaction. It is true, as the majority notes, that some of Mason's coworkers testified that Samford did not target Mason more frequently than other employees. This testimony simply reveals the presence of a genuine issue of material fact as to whether Mason was the primary target of Samford's harassment; it does not defeat in summary judgment proceedings Mason's evidence that he was the number one target.

I recognize that some of Mason's deposition testimony, when read out of context, may appear to undermine his claim. For instance, he testified that he knew Samford targeted other employees with pranks, that he understood Samford's actions to be a "joke," and that his coworkers treated him as a "normal hearing person." J.A. 42, 50. Again, these statements are not fatal on summary judgement, where all reasonable inferences must be drawn in Mason's favor. See Laber v. Harvey, 438 F.3d 404, 415 (4th Cir. 2006) (en banc). To illustrate, Mason's statement that Samford's pranks were a "joke," when read in context, can be understood to mean that he did not realize at the time that Samford's pranks were unlawful. See J.A. 50 (Mason testifying that "no one told [him] it was wrong," and explaining that he went to Martin for "help" in trying to get Samford to stop his pranks). Likewise, Mason's statement that his coworkers treated

33

him as a "normal hearing person," when read in the context of Samford's failure to provide a sign language interpreter and other employees' accusations that Mason "hear[s] what [he] want[s] to hear," show insensitivity to his disability. These statements therefore do not negate Mason's argument that Samford's conduct was subjectively and objectively offensive.

The majority, in concluding that Mason was not harassed because of his disability, relies on evidence that Samford also played pranks on Mason's non-disabled coworkers. A disabled employee, however, can be abused in ways that cannot be explained without reference to his disability, notwithstanding that non-disabled employees are exposed to the same treatment. Cf. Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 332 (4th Cir. 2003) (en banc). Thus, even though other employees took offense at Samford's pranks, a jury could reasonably find that Samford engaged in this conduct largely because he "enjoyed watching and laughing at the reactions of the only [deaf person] in the [workplace]." Id. Tellingly, most if not all of Samford's pranks specifically exploited Mason's inability to hear. Evidence that Mason's coworkers mocked his impaired speech and that his supervisors ignored his requests for disability accommodations demonstrates general workplace hostility to the presence of a person with a disability. This general hostility

34

supports Mason's claim that he was harassed because of his deafness.

The majority attempts to paint Samford's conduct toward Mason as mere "prank-playing shenanigans" that permeated the work environment and that Mason himself even instigated at times. Ante at 16. To this end, the majority emphasizes the few, isolated jokes Mason played with his coworkers over his fourteen-year tenure with Wyeth. On one occasion, Mason placed a fake snake on Roger Jones's lunch bag. On another occasion, Mason placed a dead bug on top of a candy bar on Jones's desk. (Jones liked the bug because it kept people from stealing his candy, and so he left it on his desk for years.) Mason also once tried to unlock the bathroom door when Jones was using the bathroom, a joke that Jones reciprocated the next day. Finally, Mason testified that once, outside of work, he "mooned" traffic on I-95, although he did not drop his undershorts. Mason's isolated pranks differ from Samford's persistent, abusive conduct in many ways. Most important, when Jones asked Mason not to scare him with the fake snake anymore, Mason stopped. Mason was thus willing to modify his conduct in response to his coworker's request. In contrast, Samford persisted with his harassment even though Mason repeatedly complained to Samford and Martin about Samford's conduct. Mason's pranks also differed from Samford's because Mason did not specifically exploit his coworkers'

35

physical disabilities. Additionally, Mason's pranks were reciprocal. Mason played a few jokes on Jones (whom he did not supervise), and in return Jones played a few jokes on him. In contrast, most print shop employees testified that no one played jokes on the boss, Samford. As Jones explained, "You don't usually play tricks on the boss. . . . I don't know how [Samford] would take it." J.A. 251. The majority simply fails to make the case that Mason's conduct can be equated with Samford's.

In sum, the summary judgment record, viewed in the light most favorable to Mason, reveals that he was harassed because of his disability.

B.

The next issue is whether the district court erred in concluding that Samford's conduct was not sufficiently severe or pervasive to constitute an objectively hostile or abusive work environment. The court did err. Factors relevant to whether the environment is objectively hostile include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Fox, 247 F.3d at 178. Each of these factors weighs in favor of a determination that Samford's conduct helped

36

create an objectively hostile or abusive work environment. Mason's account of his experience at work, supported by Dr. MacConnachie and his treating physician, shows that Samford's harassing conduct was constant, physically invasive, humiliating, and emotionally harmful and that it interfered with Mason's job performance.

Mason described in clear detail the feelings of anxiety and panic that Samford's pranks made him experience and how these reactions were specifically connected to his disability. He explained why it was especially frightening for him, as a deaf person, to be startled by a pinch or blast of air from a hose from someone he could not possibly hear approaching from behind. He also described how the anxiety caused him to make mistakes at work, incur minor injuries, and generally "slow[] . . . down." J.A. 90. Samford's conduct could perhaps be characterized as horseplay if directed only at hearing employees, but it is plainly abusive and offensive when directed at someone who cannot hear. Samford's insistence upon continuing the pranks despite Mason's repeated requests that he stop (which included an explanation of how the pranks affected his nervous condition) makes Samford's conduct even more abusive and offensive.

III.

37

There are genuine issues of material fact as to (1) whether Mason was harassed because of his disability and (2) whether Samford's conduct was sufficiently severe or pervasive to constitute an objectively hostile work environment. Accordingly, I believe that Mason is entitled to a trial on his hostile work environment claim. Because I would reverse the district court's grant of summary judgment to Wyeth on this claim, I dissent in part from the majority opinion. However, I concur in the majority's determination that Wyeth is entitled to summary judgment on Mason's reasonable accommodation, retaliation, and state tort claims.