**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-2516**

VLOX, LLC,

                  Plaintiff - Appellant,

          v.

MIRZADA TRANSPORT & LOGISTICS CO.,

                  Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.    Anthony J. Trenga, District Judge.  (1:11-cv-01276-AJT-TRJ)

Submitted:  October 17, 2013          Decided:  December 17, 2013

Before SHEDD and THACKER, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

Bernard J. DiMuro, Jonathan R. Mook, DIMUROGINSBERG, PC, Alexandria, Virginia, for Appellant.  Ryan C. Berry, Lesley Whitcomb Fierst, Jason C. Hicks, WOMBLE CARLYLE SANDRIDGE & RICE, LLP, Vienna, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The present appeal stems from a breach of contract dispute between a federal government contractor and one of its subcontractors. Following a five day jury trial, the jury awarded the subcontractor a total of $2,814,034.12, and the district court entered judgment in favor of the subcontractor consistent with the jury's verdict. On appeal, the federal government contractor challenges numerous rulings by the district court. Having carefully reviewed the materials before us on appeal and the relevant legal authority, we find no basis to disturb the final judgment. Accordingly, we affirm.

I.

On March 15, 2009, the United States Army (the Army) awarded VLOX, LLC (VLOX)[1] a prime contract (the Prime Contract) to provide all resources necessary to provide up to 600 trucks per day for the secure long haul distribution of reconstruction, security, and life support assets throughout the Afghanistan Theater of Operations.[2] On April 25, 2009, VLOX in turn entered into a subcontract (the Subcontract) with Mirzada Transport &

_____

[1] At a previous point in time, VLOX's name was NCL Holdings, LLC.

[2] At times, the parties refer to these services as Host Nation Trucking (HNT) services.

Logistics Company (MTC) to perform trucking services under the Prime Contract. VLOX is a United States company and MTC is an Afghan company.

Of relevance to the issues on appeal, Article Five of the Subcontract, entitled "Payment Terms" provides:

> The Prime Contractor agrees to pay the Sub Contractor on a paid as paid basis. All invoices will be submitted no later than by the 30th of each month. Sub Contractor is required to submit invoices to the Prime Contractor for Payment. Daily time sheets and performance certifications signed or otherwise authorized by a designated representative of the Prime Contractor indicating the required work has been accomplished or otherwise achieved [SIC]. Payments will be made to the Sub Contractor in response to mission number(s) invoices.

(J.A. 2690). VLOX refers to the performance certifications mentioned in this paragraph as "'Mission Sheets.'" (J.A. 37). The Subcontract required MTC to comply with all laws of the United States and all international agreements.

On December 15, 2009, VLOX terminated the Subcontract. By this time, MTC had run at least 3,200 missions for VLOX under the Subcontract. On November 22, 2011, VLOX filed the present civil action in the United States District Court for the Eastern District of Virginia based upon diversity jurisdiction, given that VLOX is a citizen of Virginia and MTC is a citizen or subject of a foreign state and the matter in controversy exceeds $75,000. See 28 U.S.C. § 1332(a)(2). Counts 1, 5, 6, and 7 of VLOX's complaint are at issue on appeal.

Count 1 alleged a claim for breach of contract under Virginia common law. Of relevance on appeal, VLOX alleged that MTC breached Article 5 of the Subcontract by failing to submit Mission Sheets to it for 562 specific missions that MTC performed pursuant to the Subcontract. The failure to so submit, VLOX further alleged, prevented VLOX from invoicing the Army for payment of those missions under the Prime Contract, resulting in VLOX losing $1,889,584 in net revenue.

Count 5 is also a claim for breach of contract under Virginia common law. In this count, VLOX alleged that MTC breached the Subcontract by making illegal protection payments to the Taliban in order to secure safe passage of MTC trucks on missions performed under the Subcontract. VLOX sought damages for this claim in an amount no less than $1,000,000.

Count 6 alleged a claim for tortious interference with contractual relations under Virginia common law. In this count, VLOX alleged that MTC tortiously interfered with VLOX's contractual relations with the Army by failing to submit the required Mission Sheets and by failing to provide VLOX with information to disprove the validity of an alleged quote by MTC's chief executive officer in the November 14, 2009 edition of the Financial Times of London that "MTC had made security payments to the Taliban." (J.A. 41). Count 6 further alleged that MTC's actions were a factor leading to the Army's

determination that VLOX was not eligible to be awarded a follow-on contract to the Prime Contract. VLOX sought damages for this claim in an amount no less than $1,000,000.

Count 7 alleged a claim for wrongful interference with a prospective business relationship under Virginia common law. Specifically, VLOX alleged that MTC wrongfully interfered with VLOX's prospective business relationship with the Army by exerting improper influence over the Afghanistan Attorney General and the Ministry of the Interior to VLOX's detriment. VLOX sought damages for this claim in an amount no less than $1,000,000.

MTC alleged two counterclaims under Virginia common law. Of relevance to the present appeal, Counterclaim 1 alleged an unjust enrichment theory. MTC alleged that VLOX was unjustly enriched by MTC's provision of shipping containers that were necessary to complete trucking missions on VLOX's behalf and for which MTC was not contractually obligated to provide under the Subcontract.

Of relevance on appeal, Counterclaim 2 alleged breach of contract as follows:

> 62. Verbal communications between [VLOX] and MTC, together with various documents exchanged and the subsequent course of dealing between the parties, together effectuated a contractual relationship between the parties.

63. This contract was never reduced to an integrated writing; however, the contractual terms can be ascertained from documents exchanged, including pricing sheets, flow-down clauses from the [Prime] [C]ontract, detailed daily reports, party correspondence, and other documents and testimony subject to discovery in this action.

64. Pursuant to this contract, MTC agreed to provide **transportation and security services**, at negotiated prices, on an as-needed basis to support [VLOX] on its [Prime] [C]ontract with the U.S. Army.

65. MTC has performed all required services consistent with the agreement of the parties. MTC's services included thousands of hazardous trucking missions throughout Afghanistan which [VLOX] requested, and the completion of which [VLOX] acknowledged by seeking payment from the U.S. Army.

66. [VLOX], however, breached its obligations under the agreement by failing to pay for services performed by MTC.

67. As a direct and proximate result of [VLOX's] breach, MTC has sustained damages.

68. MTC is entitled to damages in an amount to be determined at trial, but in no event less than $10,000,000.00, plus interest, costs and fees, including reasonable attorneys' fees.

(J.A. 69-70) (emphasis added).

Following discovery, the parties filed cross-motions for summary judgment. The district court denied both motions on September 21, 2012.

VLOX's breach of contract claim alleged in Count 1 and MTC's two counterclaims were fully tried before a jury in a five-day trial in October 2012. Counts 5, 6, and 7 never went to the jury because the district court granted judgment as a

- 6 -

matter of law in favor of MTC with respect to those claims based upon a motion for such relief made by MTC at the close of VLOX's case-in-chief. With respect to these counts, the district court concluded that VLOX had failed to present sufficient evidence to permit a reasonable jury to render a verdict in VLOX's favor. On appeal, VLOX acknowledges such failure, but blames it on several adverse evidentiary rulings by the district court.

The trial did not end well for VLOX. The jury found in MTC's favor with respect to Count 1 of VLOX's complaint for breach of contract. The jury awarded MTC $273,250 with respect to its unjust enrichment counterclaim (Counterclaim 1) for reimbursement of its costs in providing shipping containers to complete trucking missions for VLOX. The jury also found in favor of MTC on its breach of contract counterclaim (Counterclaim 2) with respect to transportation services that it provided to VLOX in the amount of $1,082,634.12 and with respect to security services that it provided to VLOX in the amount of $1,458,150.

Of relevance on appeal, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, VLOX renewed, post-verdict, its prior motion for judgment as a matter of law with respect to Counterclaims 1 and 2. Alternatively, VLOX moved for a new trial with respect to these counterclaims.

Notably, VLOX did not renew, post-verdict, its motion for judgment as a matter of law with respect to Count 1 of its own complaint for breach of contract. Rather, VLOX dropped the following cryptic footnote in its memorandum in support of its post-verdict motion for judgment as a matter of law or, in the alternative, for a new trial with respect to MTC's counterclaims:

> VLOX does not concede that the jury's verdict as to VLOX's Count I for MTC's breach of contract was correct. To the contrary, VLOX asserts that the verdict was incorrect in that regard, and expressly reserves its rights to appeal.

Memorandum in Support of Motion for Judgment as a Matter of Law in Favor of VLOX, LLC, or, in the Alternative, for a New Trial and/or Other Relief at 1, n.1, VLOX, LLC v. Mirzada Transport & Logistics Co., No. 1:11-cv-01276 (E.D.Va. Nov. 2, 2012), ECF No. 280. The district court denied VLOX's post-verdict motion for judgment as a matter of law or, in the alternative, for a new trial with respect to MTC's counterclaims.

On November 13, 2012, the district court entered judgment in favor of MTC consistent with the jury's verdict. This timely appeal followed.


II.

On appeal, VLOX first challenges the district court's entry of judgment in favor of MTC with respect to Count 1 of its own

- 8 -

complaint alleging that MTC breached the Subcontract by failing to submit Mission Sheets for 562 missions that MTC performed under the Subcontract. According to VLOX, MTC failed to present sufficient evidence to create a genuine issue of material fact with respect to this claim, and therefore, the district court erred by submitting such claim to the jury instead of entering judgment as a matter of law in its favor for $1,889,584. In other words, VLOX contends that MTC failed to introduce sufficient evidence at trial to rebut the evidence that VLOX had already introduced with respect to this claim in its case-in-chief.

Supreme Court and Fourth Circuit precedent bar VLOX's sufficiency of the evidence challenge on appeal because VLOX failed to move post-verdict for judgment as a matter of law with respect to this claim, pursuant to Rule 50(b). See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 546 U.S. 394, 404 (2006) (holding that party's "failure to comply with Rule 50(b) forecloses its challenge to the sufficiency of the evidence" on appeal); Belk, Inc. v. Meyer Corp., 679 F.3d 146, 160 (4th Cir. 2012) (appellant's "failure to move pursuant to Rule 50(b) forfeits the sufficiency of the evidence challenge on appeal"); A Helping Hand, LLC v. Baltimore County, Md., 515 F.3d 356, 369-70 (4th Cir. 2008) (appellant "failed to move for judgment under Rule 50(b) in the district court and so did not preserve this

challenge to the sufficiency of the evidence for appellate review"). In this regard, we hold that the cryptic footnote regarding Count 1 of VLOX's complaint that VLOX included in its memorandum in support of its Rule 50(b) motion pertaining to MTC's counterclaims is wholly inadequate to qualify as VLOX moving, post-verdict, for judgment as a matter of law with respect to Count 1 for lack of sufficient evidence to send the claim to the jury.

Alternatively, assuming arguendo that VLOX had moved post-verdict for judgment as a matter of law with respect to Count 1 of its complaint on the ground that MTC had failed to introduce sufficient evidence at trial to rebut the evidence that it (VLOX) had already introduced with respect to this claim in its case-in-chief, the district court would have been correct in denying such motion. We review the denial of a motion for judgment as a matter of law de novo, viewing the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in the nonmovant's favor, without weighing the evidence or assessing the credibility of the witnesses. Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003).

VLOX contends that it is entitled to judgment as a matter of law with respect to Count 1 because, according to VLOX, Article 5 of the Subcontract can only be read to require that

- 10 -

MTC provide, as an affirmative obligation, a Mission Sheet to a designated representative of VLOX for every mission that MTC completed under the Subcontract and to require every MTC "truck driver . . . to obtain signatures of authorized Army personnel on the Mission Sheet at both the cargo's point of origin and the point of delivery when the cargo was loaded and unloaded." (VLOX's Opening Br. at 13).

MTC makes numerous points in response. First, the term "Mission Sheet" does not appear anywhere in the entire Subcontract. Second, the only document that Article 5 of the Subcontract expressly requires to be submitted in order to receive payment is an invoice; the certification language is only a sentence fragment. Third, MTC's Vice President, Abdul Hasib (MTC Vice President Hasib), testified at trial that MTC provided Mission Sheets for some missions merely because VLOX asked for them, rather than due to any contractual obligation. Fourth, under cross examination by MTC, David Etchart, VLOX's former president, admitted that unlike the Subcontract between VLOX and MTC, the subcontract that VLOX subsequently drafted for use with its other subcontractors specifically requires the submission of Mission Sheets to VLOX. Fifth, at most, Article 5 required Mission Sheets as a precondition to receiving any payment for its services, and therefore, MTC's alleged failure to satisfy this condition with respect to the 562 missions at

- 11 -

issue subjects MTC to nonpayment for such missions, but does not constitute breach of the Subcontract by MTC. Sixth, through the testimony of MTC Vice President Hasib, MTC demonstrated at trial: (1) that submission of a Mission Sheet with all of the details and signatures that VLOX claims were required was far from within MTC's control; (2) that most of the drivers hired by MTC were sub-subcontractors who owned their own trucks; and (3) that some of these sub-subcontractors withheld Mission Sheets from MTC when VLOX failed to pay for previously completed missions.

The bottom line for us is that VLOX has failed to establish that its reading of the language in Article 5 (as affirmatively requiring MTC to submit a Mission Sheet to VLOX for every mission it performs under the Subcontract) is the only reasonable reading of such language. In particular, we agree with MTC's argument that the jury could have reasonably read Article 5 as conditioning mission payment to MTC on MTC's submission of a corresponding Mission Sheet, but not placing an affirmative obligation on MTC to so submit. Therefore, because the record is undisputed that VLOX never paid MTC for the 562 missions at issue in Count 1, the entire underpinning of VLOX's breach of contract claim based upon MTC's failure to provide Mission Sheets for such missions is nonexistent. Accordingly,

- 12 -

we affirm the judgment in favor of MTC with respect to Count 1 of VLOX's complaint.

## III.

VLOX next challenges the district court's denial of its post-verdict motion for judgment as a matter of law with respect to Counterclaim 1, alleging a claim for unjust enrichment pertaining to MTC's provision of shipping containers to complete missions for VLOX. According to VLOX, the evidence of this claim at trial was insufficient to support the jury's award of $273,250. Again, we review the denial of a motion for judgment as a matter of law de novo, viewing the evidence in the light most favorable to the nonmovant, here MTC, and drawing all reasonable inferences in the nonmovant's favor, without weighing the evidence or assessing the credibility of the witnesses. Ocheltree, 335 F.3d at 331.

In order to prevail upon its unjust enrichment claim, MTC was required to proffer sufficient evidence for a reasonable jury to find by a preponderance of the evidence that: (1) MTC conferred a benefit on VLOX; (2) VLOX knew of the benefit and should reasonably have expected to repay MTC; and (3) VLOX accepted or retained the benefit without paying for its value. Schmidt v. Household Finance Corp., 661 S.E.2d 834, 838 (Va. 2008). In support of the district court's entry of judgment in

its favor with respect to its unjust enrichment claim, MTC points to: (1) certain trial testimony by MTC Vice President Hasib; (2) certain deposition testimony by VLOX's chief financial officer and Rule 30(b)(6)[3] corporate designee, William Gombar (VLOX CFO Gombar), read to the jury; and (3) Defendant's Exhibit 441R.

MTC points to testimony by MTC Vice President Hasib that: (1) containers were not included on the price list in the Subcontract; (2) after execution of the Subcontract, VLOX requested that MTC furnish containers; (3) MTC furnished containers for a VLOX mission when necessary to complete the mission; (4) VLOX knew about and accepted the benefit of those containers; (5) the parties engaged in negotiations about the price that VLOX would pay for the use of the containers furnished by MTC (MTC had some of its own containers and paid to rent others); (6) the parties agreed upon $150 per mission day[4];

---

[3] See Federal Rule of Civil Procedure 30(b)(6) (governing corporate designation of deposition witness to testify on its behalf).

[4] A "mission day" consisted of a mission up to 200 kilometers one way. (J.A. 1379). Thus, for example, a mission trip from Kabul to Kandahar consisted of three mission days. Many of the 3,200 mission trips MTC performed for VLOX consisted of between three and five mission days. Some mission trips even consisted of six mission days.

and (7) VLOX never paid MTC for the containers despite the fact that VLOX had enjoyed the benefit of their use.

VLOX CFO Gombar's deposition testimony read to the jury regarding MTC's provision of containers is consistent with the testimony of MTC Vice President Hasib and supports MTC's unjust enrichment theory:

> Q.    But then some of the missions that the government requested required the contractor to obtain the container?
>
> A.    Yeah.   It requested the contractor to bring an empty container.
>
> Q.    And when that happened the  -- [VLOX] requested that MTC provide the container?
>
> A.    Yes.
>
> Q.    And the container  -- container prices were not included in the original subcontract agreement, right?
>
> A.    No.
>
> Q.    But it was understood that [VLOX] would have to reimburse MTC for the cost of that container, correct?
>
> A.    We were looking into negotiating the price for the use of their container.
>
> Q.    Did [VLOX] though accept the benefit of MTC's providing the container for those missions right?
>
> A.    Yes.

(J.A. 1656-57).    The jury also heard deposition testimony by VLOX CFO Gombar that VLOX never paid MTC any separate payments for containers furnished by MTC during missions that it ran for

- 15 -

VLOX, and that the parties had estimated that a fair amount for the cost of a container was $150 per mission day.

Defendant's Exhibit 441R, which MTC introduced at trial without objection from VLOX, is a spreadsheet prepared by VLOX CFO Gombar in May 2011. In deposition testimony read to the jury, VLOX CFO Gombar testified that this spreadsheet compiled every mission that MTC had performed for VLOX, but for which VLOX had not paid MTC. For every mission, the spreadsheet specifies the dispatch date, whether the mission included a container, and the number of mission days attributed to such mission.

We hold that the evidence just recounted, when viewed in the light most favorable to MTC, is sufficient for a reasonable jury to find that: (1) MTC conferred a $273,250 benefit on VLOX in the form of container usage and container management; (2) VLOX knew of that benefit and should reasonably have expected to repay MTC; and (3) VLOX accepted or retained the benefit without paying for its value. Accordingly, we affirm the district court's entry of judgment in favor of MTC with respect to Counterclaim 1.

IV.

VLOX challenges the district court's denial of its post-verdict motion for judgment as a matter of law with respect

to Counterclaim 2, alleging breach of contract and seeking reimbursement for transportation and security services that it provided VLOX. We review the district court's denial of this motion de novo, viewing the evidence in the light most favorable to the nonmovant, here MTC, and drawing all reasonable inferences in the nonmovant's favor, without weighing the evidence or assessing the credibility of the witnesses. Ocheltree, 335 F.3d at 331. The jury found in favor of MTC on this claim, awarding MTC $1,082,634.12 for transportation services and $1,458,150 for security services.

A. Transportation Services

With respect to transportation services, MTC's theory at trial was that VLOX breached the Subcontract by failing to pay MTC for all the missions it performed under the Subcontract. In its post-verdict motion for judgment as a matter of law, VLOX did not dispute that it had failed to pay MTC for all of the missions that MTC had performed for VLOX under the Subcontract. However, VLOX argued that MTC failed to provide it invoices for such missions and that such failure relieved VLOX's contractual obligation to pay MTC for such missions. According to VLOX, providing VLOX an invoice for each mission was a condition precedent for payment under Article 5 of the Subcontract. This is the sole basis upon which VLOX challenged the jury's verdict with respect to the jury's award in favor of MTC for

- 17 -

transportation services. Notably, VLOX did not take issue with the trial testimony of MTC Vice President Hasib that the parties had a course of dealing with respect to Article 5's invoicing requirement. According to VLOX's post-verdict Rule 50(b) motion, during his trial testimony, MTC Vice President Hasib described a process by which VLOX would propose an invoice, MTC would merely modify it slightly as deemed necessary, and then MTC would send it back to VLOX for payment. "But," VLOX argued, "that simply demonstrates that MTC's burden of meeting this condition for payment was quite low, and it failed to meet it anyway." Memorandum in Support of Motion for Judgment as a Matter of Law in Favor of VLOX, LLC, or, in the Alternative, for a New Trial and/or Other Relief at 6, VLOX, LLC v. Mirzada Transport & Logistics Co., No. 1:11-cv-01276 (E.D.Va. Nov. 2, 2012), ECF No. 280.

In response, MTC reiterated the point made by MTC Vice President Hasib that the spreadsheet of completed missions that VLOX gave to MTC to submit back to VLOX "was the invoicing process." MTC's Opposition to VLOX's Motion for Judgment as a Matter of Law, or, in the Alternative, for a New Trial and/or Other Relief at 9, VLOX, LLC v. Mirzada Transport & Logistics Co., No. 1:11-cv-01276 (E.D.Va. Nov. 9, 2012), ECF No. 281. When the relationship between VLOX and MTC deteriorated, VLOX stopped providing information to MTC. MTC also pointed to

- 18 -

deposition testimony the jury heard by VLOX CFO Gombar admitting that VLOX had not paid MTC for $1.1 million dollars' worth of transportation expenses for missions that MTC performed under the Subcontract. MTC accurately pointed out that this amount was calculated based upon a spreadsheet prepared by VLOX obtained by MTC during discovery in the present litigation, which is the same type of spreadsheet that MTC would submit back to VLOX in satisfaction of the invoicing requirement. MTC further accurately pointed out that VLOX did not list MTC's failure to submit invoices as an affirmative defense to this claim in its answer or argue such a defense to the jury.

In denying VLOX's post-trial motion for judgment as a matter of law with respect to Counterclaim 2 as such counterclaim pertained to transportation services, the district court stated:

> The Court also finds and concludes that the evidence was sufficient as a matter of law to sustain the jury's verdict as to transportation services. In that regard, the jury determined that MTC was entitled to recover . . . $1,082,634.12, which is essentially the amount that appeared in plaintiff's own books and records and the amount that plaintiff's designated representative admitted was due and owing to MTC based on its mission sheets submitted for payment and payments from the government.

(J.A. 3004).

The parties' opposing arguments on appeal essentially repeat their arguments before the district court. We affirm the

- 19 -

district court's entry of judgment in favor of MTC with respect to this claim pertaining to MTC's provision of transportation services. When the evidence in the record is viewed in the light most favorable to MTC and all reasonable inferences therefrom are drawn in its favor, sufficient evidence exists to support the jury's verdict.

B. Security Services

With respect to security services, MTC's theory at trial was that MTC arranged for the provision of licensed security on virtually every mission that it performed for VLOX between May and November 2009, and that VLOX agreed to pay MTC a flat rate for security services of at least $200 per mission day regardless of whether MTC actually provided security for every mission. According to MTC, the $200 per mission day rate for security services was a flat rate or so called blended rate upon which it and VLOX had agreed because some missions were very expensive (upwards of $2,500 to $3,000) and others were not as expensive. The jury awarded MTC a total of $1,458,150 for its provision of security services.

In its post-verdict Rule 50(b) motion, VLOX disagreed with MTC's flat/blended rate theory. VLOX did concede, however, that it agreed to pay MTC $200 for each mission day for which MTC actually provided security services. Nonetheless, VLOX argued that MTC failed to adduce evidence at trial demonstrating that

MTC actually provided security services for any of the missions it performed under the Subcontract. According to VLOX, in order to sustain the jury's $1,458,150 award for security services, MTC was required to provide the jury with the following evidence, but failed to do so: (1) a copy of every written subcontract that MTC had with a security provider that MTC hired to perform security services on missions that MTC performed for VLOX; (2) an invoice from such security provider for every VLOX mission it worked; and (3) copies of bank statements, canceled checks, or any other evidence which corroborates MTC's claim for breach of contract damages related to security services.

MTC points to the following evidence before the jury in support of the jury's verdict with respect to its provision of security services on behalf of VLOX. First, MTC points to the testimony of David Etchart, VLOX's president from late September 2009 until the end of December 2011, that: (1) the Prime Contract required VLOX to provide security for all missions; and (2) the per mission-day rate the federal government paid VLOX under the Prime Contract included compensation for mission security services regardless of the type of mission and regardless of whether VLOX or the federal government actually provided mission security.

MTC next points to the testimony of MTC Vice President Hasib that: (1) the Subcontract did not provide payment to MTC

- 21 -

for security services; (2) one week after the Subcontract started, MTC and VLOX reached a verbal agreement that, in order to compensate MTC for sourcing mission related security services for missions MTC ran under the Subcontract, VLOX would pay MTC an additional flat rate of $280.00 per mission day; and (3) once MTC and VLOX reached this verbal agreement, MTC provided security for the missions it ran for VLOX under the Subcontract by hiring Watan Risk Security (Watan) and Solution Group.

MTC also points out that the jury heard deposition testimony by VLOX CFO Gombar consistent with MTC Vice President Hasib's testimony, with the exception that VLOX CFO Gombar testified that the agreed rate for security services was $200 per mission-day. The jury also heard deposition testimony by VLOX CFO Gombar from which the jury could have reasonably inferred that VLOX paid MTC for security services in August 2009 based upon a flat rate of $200 per mission day without requiring any type of substantiation from MTC.

During his testimony, MTC Vice President Hasib explained that the general lack of documentary evidence in support of its claim that MTC actually sourced security for the missions it ran for VLOX under the Subcontract stemmed from the fact that Afghanistan is a cash-based society based on trust, rather than written promises or contracts. MTC Vice President Hasib also identified Defendant's Exhibits 278 and 279 as receipts for cash

payments that MTC made to Watan for security services that Watan provided during missions that MTC performed under the Subcontract. One receipt was for $400,000 and the other for $100,000.

Of relevance here, the record also contains a May 2009 email in which, after the Subcontract's execution, VLOX asked MTC to obtain security services for the missions that MTC ran for VLOX. Defendant's Exhibit 441R established the number of mission days that MTC performed under the Subcontract.

Viewing the evidence before the jury regarding the security services aspect of MTC's breach of contract counterclaim in the light most favorable to MTC and drawing all reasonable inferences from such evidence in MTC's favor, we hold that the jury's verdict is supported by sufficient evidence. From the evidence outlined above, a reasonable jury could find that VLOX and MTC had an agreement for VLOX to pay MTC a flat/blended rate of $200 per mission day to compensate MTC for any and all security services that MTC provided on behalf of VLOX for the duration of the Subcontract. The jury needed only to consider Defendant's Exhibit 441R, a spreadsheet compiled by VLOX which lists every mission MTC performed for VLOX under the Subcontract, to calculate the total amount of compensation due MTC for security services. Because the evidence supports MTC's theory of at least a $200 per mission-day rate, regardless of

the cost of security per mission, VLOX's argument that MTC was required to show documentary evidence that it provided security for every mission day and MTC's cost of such security is without merit.

Accordingly, we affirm the district court's entry of judgment in favor of MTC based upon the jury's verdict pertaining to MTC's provision of security services.

V.

On appeal, VLOX seeks a new trial on Counts 1, 5, 6, and 7 of its complaint and upon MTC's successful counterclaims based upon numerous evidentiary rulings by the district court that VLOX contends are erroneous. We review the district court's evidentiary rulings for abuse of discretion. Belk, Inc., 679 F.3d at 161.

Our review of VLOX's evidentiary challenges reveals that all are without merit. Three are worthy of our addressing separately. In Count 5 of VLOX's complaint, VLOX alleged that MTC breached the Subcontract by paying bribes to the Taliban for safe passage of missions that MTC performed for VLOX under the Subcontract. VLOX also wanted to use MTC's alleged bribery of the Taliban in support of its tort claims alleged in Counts 6 and 7 of its complaint and in defense of MTC's Counterclaim 2.

On appeal, VLOX specifically challenges the district court's grant of MTC's motion in limine to exclude the following from being submitted as evidence at trial: (1) a November 14, 2009 newspaper article appearing in the Financial Times of London, purporting to quote MTC Chief Executive Officer Haji Fatah (MTC CEO Fatah) as saying that "'Every truck costs about $200 as a bribe I pay on the route – to police or Taliban. . . . The Taliban don't care about small money: they ask for $10,000, $20,000 or $50,000 when they kidnap people.'" (J.A. 575); (2) testimony by David Etchart, VLOX's former president, that he asked a VLOX employee who allegedly speaks English and Dari to ask MTC CEO Fatah whether he had made the statements quoted in the Financial Times article, and after the employee complied with his request, MTC CEO Fatah remained silent; and (3) a June 2010 report, entitled Warlord, Inc.: Extortion and Corruption Along the U.S. Supply Chain in Afghanistan (the Warlord Report), prepared by the majority staff of the Subcommittee on National Security and Foreign Affairs of the Committee on Oversight and Government Reform in the United States House of Representatives, which report republishes the alleged quote by MTC CEO Fatah in the Financial Times article, and in which report the following statement is made:

> **Finding:** Within the HNT contractor community, many
> believe that the highway warlords who nominally guard
> the trucks in turn make protection payments to

> insurgents to coordinate safe passage. This belief is
> evidenced in numerous documents, incident reports, and
> e-mails that refer to attempts at Taliban extortion
> along the road. The Subcommittee has not uncovered
> any direct evidence of such payments and Commander
> Ruhullah, the Popal brothers, and Ahmed Wali Karzai
> all adamantly deny that any convoy security commanders
> pay insurgents. According to experts and public
> reporting, however, the Taliban regularly extort rents
> from a variety of licit and illicit industries, and it
> is plausible that the Taliban would try to extort
> protection payments from the coalition supply chain
> that runs through territory in which they freely
> operate.

(J.A. 231).

VLOX wanted to introduce these three items of evidence at trial to prove the statements attributed to MTC CEO Fatah were in fact made and that MTC in fact made illegal security bribes to the Taliban. During the oral argument colloquy with the district court on MTC's motion in limine, VLOX admitted under questioning by the district court that the Warlord Report did not find that any bribes to the Taliban were, in fact, made. VLOX further admitted that although the Warlord Report reported much talk about government contractors paying the Taliban security bribes and reported a lot of anecdotal statements about such behavior, it also reported the specific denials by the people in authority within the Afghan government and the authors of the report's failure to uncover any direct evidence of such illicit payments. VLOX further admitted that the alleged quote by MTC CEO Fatah in the Financial Times cannot come into

evidence as a party admission under Federal Rule of Evidence 801(d)(2)(A) unless VLOX can prove the foundational fact that MTC CEO Fatah actually made the statement.  Notably, MTC CEO Fatah steadfastly denies making the statement.

While still at the hearing on MTC's motion in limine, VLOX proffered the testimony mentioned above of its former president, David Etchart, regarding MTC CEO Fatah's silence in the face of the question about the Financial Times quote allegedly asked of him in Dari by a VLOX employee.  In response to questioning by the district court, VLOX informed the district court that it would not call such employee to testify regarding what he actually asked MTC CEO Fatah; rather, it would only call its former president, David Etchart, who does not speak Dari.  VLOX also informed the district court that it did not intend to call as a witness the reporter who wrote the Financial Times article or the interpreter who allegedly reported the quote to the reporter.

In its written opinion granting MTC's motion in limine, the district court found that in the absence of necessary foundational testimony, the statements reported in the Financial Times article and David Etchart's testimony regarding such statements would be inadmissible hearsay.  The district court further found

that the statements in the FINANCIAL TIMES article are not admissible under either Fed. R. Evid. 803(8) (pertaining to governmental findings based on the investigation set forth in [the Warlord Report] or Fed. R. Evid. 807 (the residual hearsay exception). The [Warlord Report] specifically disclaimed any finding that payments had in fact been made to the Taliban or other insurgent groups, and the conditions necessary for application of the residual hearsay exception under Fed. R. Evid. 807 have not been met.

(J.A. 906-07).

We hold the district court did not abuse its discretion in granting MTC's motion in limine with respect to these three items of evidence. On appeal, VLOX rehashes the same meritless arguments that it had made below in opposition to MTC's motion in limine. VLOX's entire position on this issue hinges upon it being able to prove that MTC CEO Fatah actually made the statements quoted in the Financial Times article. VLOX attempts to so prove through its silent admission theory. However, for silence to be admitted into evidence as a tacit admission, there must be preliminary proof of an accusatory statement. United States v. Williams, 445 F.3d 724, 736 (4th Cir. 2006). Here, the district court reasonably concluded such proof was lacking.

VI.

In conclusion, we affirm the judgment below in toto.[5]  We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED

---

[5] With respect to arguments and/or assignments of error made by VLOX on appeal that we have not expressly addressed in this opinion, we have so considered and find them to be without merit.